**CT Corporation**

**Service of Process Transmittal**
03/06/2019
CT Log Number 535041806

TO:   KRISTINE LOFRESE
      DITECH FINANCIAL LLC
      1100 VIRGINIA DR
      FORT WASHINGTON, PA 19034-3276

RE:   **Process Served in Tennessee**

FOR:  DITECH FINANCIAL LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JULIE RENE MULANAX, Pltf. vs. QUICKEN LOANS, INC., and DITECH FINANCIAL, LLC, Dfts. |
| **DOCUMENT(S) SERVED:** | Letter, Complaint, Affidavit, Exhibit(s) |
| **COURT/AGENCY:** | Shelby County Chancery Court, TN<br>Case # CH190324 |
| **NATURE OF ACTION:** | Foreclosure Litigation - Mortgage - 1194 Wingfield Road in Memphis, Tennessee |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Knoxville, TN |
| **DATE AND HOUR OF SERVICE:** | By Courier on 03/06/2019 |
| **JURISDICTION SERVED :** | Tennessee |
| **APPEARANCE OR ANSWER DUE:** | 03/18/2019 at 10:00 a.m. |
| **ATTORNEY(S) / SENDER(S):** | Kevin A. Snider<br>Snider & Horner, PLLC<br>9056 Stone Walk Place<br>Corporate Gardens<br>Germantown, TN 38138<br>901-751-3777 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/06/2019, Expected Purge Date: 03/11/2019<br><br>Image SOP<br><br>Email Notification,  KRISTINE LOFRESE  kristine.lofrese@ditech.com<br><br>Email Notification,  MANISH VERMA  manish.verma@ditech.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 300 Montvue RD<br>Knoxville, TN 37919-5546 |
| **TELEPHONE:** | 312-345-4336 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EXHIBIT A



# FedEx Express US Airbill

**Tracking Number** 8082 5184 6952

**Form 0215** Recipient's Copy

## 1 From

Date

Sender's Name

Phone 901 751-3777

Company SNIDER & HORNER, PLLC.

Address 9054 STONE WALK PL

City GERMANTOWN  State TN  ZIP 38138-7828

## 2 Your Internal Billing Reference

## 3 To

Recipient's Name Ditech Financial, LLC

Company c/o CT Corporation System

Address 300 Montvue Road

☐ HOLD Weekday
FedEx location address REQUIRED. NOT available for FedEx First Overnight.

☐ HOLD Saturday
FedEx location address REQUIRED. Available ONLY for FedEx Priority Overnight and FedEx 2Day to select locations.

Address

City Knoxville  State TN  ZIP 37919

0119821415

EXHIBIT A

8082 5184 6952

## 4 Express Package Service
*To most locations.
NOTE: Service order has changed. Please select carefully.

Packages up to 150 lbs. *For packages over 150 lbs., use the FedEx Express Freight US Airbill.*

### Next Business Day

☐ FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☒ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.* Saturday Delivery NOT available.

### 2 or 3 Business Days

☐ FedEx 2Day A.M.
Second business morning.* Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Express Saver
Third business day.* Saturday Delivery NOT available.

## 5 Packaging *Declared value limit $500.

☒ FedEx Envelope*   ☐ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

## 6 Special Handling and Delivery Signature Options

☐ SATURDAY Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without obtaining a signature for delivery.

☒ Direct Signature
Someone at recipient's address may sign for delivery. Fee applies.

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only. Fee applies.

### Does this shipment contain dangerous goods?
One box must be checked.

☒ No   ☐ Yes As per attached Shipper's Declaration.   ☐ Yes Shipper's Declaration not required.   ☐ Dry Ice Dry Ice, 9, UN 1845 ___ kg   ☐ Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging or placed in a FedEx Express Drop Box.

## 7 Payment Bill to:

Enter FedEx Acct. No. or Credit Card No. below.

☒ Sender Acct. No. in Section 1 will be billed.   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Obtain recip. Acct. No. ☐

Total Packages   Total Weight ___ lbs.   Credit Card Auth.

611

*Our liability is limited to US$100 unless you declare a higher value. See the current FedEx Service Guide for details.

Rev. Date 3/12 · Part #163134 · ©1994–2012 FedEx · PRINTED IN U.S.A. SRM



**ATTORNEYS AT LAW**
A Professional Limited Liability Company

9056 STONE WALK PLACE
GERMANTOWN, TN 38138-7824
TELEPHONE (901) 751-3777
FACSIMILE (901) 759-0041
WWW.KEVINSNIDER.COM

Kevin A. Snider, J.D., C.F.E.
*Founding Attorney* [1, 2]

Gail W. Horner
*Attorney* [3, 4]

Erin M. Shea
*Attorney*

Joshua B. Bradley
*Attorney*

Elizabeth B. Stagich
*Attorney*

1  Also Licensed as a Certified Fraud Examiner
2  Also Certified as a Civil Trial Specialist and
   Civil Pretrial Specialist by the National Board
   of Trial Advocacy
3  Also Certified as a Rule 31 Listed General Civil
   Mediator
4  Also Certified as a Rule 31 Listed Family Mediator

This communication is from a debt collector and the
purpose of this communication is to collect a debt and
any information obtained will be used for that and
other purposes allowed by law. Unless you, within
thirty days after the receipt of this communication,
dispute the validity of the debt, or any portion thereof,
the debt will be assumed to be valid by us. If you
notify us within a thirty-day period that the debt, or any
portion thereof, is disputed, we will obtain verification
of the debt or a copy of a judgment against you and a
copy of such verification or a judgment will be mailed
to you by us and upon your written request within the
thirty-day period, we will provide you with the name
and address of the original creditor if different from
the current creditor.

---

March 5, 2019

**VIA EMAIL & FEDEX**

**PADGETT LAW GROUP**
6267 Old Water Oak Road, Suite 203
Tallahassee, FL  32312

**QUICKEN LOANS, INC.**
c/o CT Corporation System
300 Montvue Road
Knoxville, TN  37919

**Ditech Financial, LLC**
c/o CT Corporation System
300 Montvue Road
Knoxville, TN  37919

*Re:  Julie Rene Mulanax v. Quicken Loans & Ditech Financial*

To Whom It May Concern:

Be advised that our office have been retained by Julie Rene Mulanax for
representation in regard to a lawsuit against Quick Loans and Ditech
Financial.  To that end, enclosed you will find a copy of the <u>Complaint</u> as
well as a copy of the <u>Temporary Restraining Order</u> that we obtained today
to stop any collection and foreclosure proceedings in this matter.
Obviously, we will be expecting you to comply with the Temporary
Restraining Order and stop any and all collection efforts and foreclosure
proceedings.

Also enclosed, you will find a <u>Notice for the Temporary Injunction
Hearing that is scheduled for March 18, 2019</u> at 10:00 a.m. in Part 3 of
Shelby County Chancery Court.

If you have any additional questions, please feel free to give me a call.

Sincerely,
SNIDER & HORNER, PLLC

*Kevin A. Snider*
Kevin A. Snider
Attorney at Law

Enclosures
cc:  Ms. Julie Mulanax

KAS/sjs

**CHANCERY COURT**

MAR 0 5 2019

**NOT FOR SERVICE OR RETURN USE**

THE STATE OF TENNESSEE

TO _____

Quicken Loans, Inc. - c/o CT Corporation System, 300 Montvue Road, Knoxville, TN 37919

Ditech Financial, LLC - c/o CT Corporation System, 300 Montvue Road, Knoxville, TN 37919

**AGENTS AND ATTORNEYS - Greetings**

WHEREAS   Julie Rene Mulanax

hath lately exhibited _____ Complaint in the Chancery Court of

Shelby County against you the said                    **Defendant**

_____, as Defendants therein, and obtained from the

Honorable _____, Chancellor, a fiat that a restraining order issue

according to the prayer of said complaint. We, therefore in consideration of the premises, do strictly restrain and

command you, the said   Defendant and your assignees, agents, servants, employees and attorneys

and all persons in active concert and participation with you

and all and every the persons before mentioned, and each and every of you, that you and every of you, do absolutely

desist and refrain and be restrained _____

from all efforts to collect any alleged unpaid debt from the Plaintiff and from any and all foreclosure proceedings against the Plaintiff's real property at 1194 Wingfield Road in Memphis, Tennessee

until further orders of our said Court to the contrary. And this you shall in no wise omit, under the penalty prescribed by law.

A TRUE COPY-ATTEST

Donna L. Russell, Clerk & Master

By_____ D.C. & M.

**JoeDae L. Jenkins**

Witness, Donna L. Russell, Clerk and Master of said Court,

This 5th day of March, 2019

Donna L. Russell, Clerk

By_____ Deputy Clerk and Master

_____
Chancellor

This 5th day of March, 20 19, at 1:0 P m.

EXHIBIT A

Julie Rene Mulanax

Office of Clerk and Master
Chancery Court, Shelby County
Memphis, TN

vs.        No. CH-19-0324

Quicken Loans, Inc. and Ditech Financial, LLC

5th ____ day of March ____ 20 19

TO Quicken Loans, Inc. - c/o CT Corporation System, 300 Montvue Road, Knoxville, TN 37919

Ditech Financial, LLC - c/o CT Corporation System, 300 Montvue Road, Knoxville, TN 37919

You are hereby notified that _____
a Temporary Injunction Hearing will be held on:   March 18, 2019 at 10:00 AM

CHANCERY COURT

MAR 0 5 2019

NOT FOR SERVICE
OR RETURN USE

Respectfully,

DONNA L. RUSSELL, C. & M.

By [signature]

Kevin A. Snider / Snider & Horner, PLLC

Attorney for _____ Plaintiff _____

EXHIBIT A

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

FILED COPY

SHELBY COUNTY
CHANCERY COURT

MAR - 5 2019

DONNA L. RUSSELL, C & M
TIME:_____ BY:_____

JULIE RENE MULANAX,

      Plaintiff,

VS.

QUICKEN LOANS, INC., and
DITECH FINANCIAL, LLC,

      Defendants.

Docket No. CH- 19- 0324
Part
JURY DEMANDED  III

---

## COMPLAINT FOR DECLARATORY JUDGMENT, DAMAGES, AND REQUEST FOR INJUNCTIVE RELIEF

---

COME NOW the Plaintiff, Julie Rene Mulanax, by and through her legal counsel of record, Kevin A. Snider of Snider & Horner, PLLC, and files her Complaint for Declaratory Judgment, Damages, and Request for Injunctive Relief and would state to this Honorable Court as follows:

### JURISIDICTION AND VENUE

1. The Plaintiff, Julie Rene Mulanax (hereinafter referred to as "Plaintiff"), is an adult resident and citizen of Shelby County, Tennessee.

EXHIBIT A

2. The Defendant, Quicken Loans, Inc. (hereinafter referred to as "Defendant" and/or "Quicken") is an active, for-profit corporation lawfully registered with the Secretary of the State of Tennessee transacting business in Shelby County, Tennessee, and may be served with process through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919.

3. The Defendant, Ditech Financial, LLC (hereinafter referred to as "Defendant" and/or "Ditech"), is an active, limited liability corporation lawfully registered with the Secretary of the State of Tennessee transacting business in Shelby County, Tennessee, and may be served with process through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919.

4. For purposes of this Complaint, all Defendants named in Paragraphs 2 and 3 shall be collectively referred to as "the Defendants".

5. Jurisdiction and Venue in the instant case are properly found in Shelby County, Tennessee, pursuant to T.C.A. § 20-4-101 and related sections.

## FACTUAL ALLEGATIONS

6. On or about May 30, 2007, the Plaintiff purchased the real property municipally known as 1194 Wingfield Road, Memphis, Tennessee (hereinafter referred to as the "Property") from George Parks and Jean Burk. A copy of the Warranty Deed is attached hereto as Exhibit A.

7. On the same date, the Plaintiff financed and took out a mortgage on the Property with Quicken in the amount of $69,000.00. A copy of the Deed of Trust is attached hereto as Exhibit B.

*- Page 2 of 13 -*

EXHIBIT A

8. Thereafter, the Plaintiff made her monthly payments on the home pursuant to the terms and conditions of a note and the deed of trust.

9. Upon information and belief, the indebtedness was assigned to Bank of America, Green Tree, and ultimately to Ditech. It should be noted that the Plaintiff did not receive timely and proper notices of any assignments or transfers and nothing has been filed or recorded in the Shelby County Register's Office regarding such.

10. In 2011, the Plaintiff made her monthly mortgage payment to Bank of America (as she had for some time) and was then contacted by Green Tree essentially stating that she was behind in her mortgage as they never received any payments from Bank of America. The Plaintiff contacted Bank of America and was informed that the Plaintiff's payments were sent to Green Tree.

11. The Plaintiff continued to make her payments in 2012, 2013, and 2014.

12. Sometime in 2015, the Plaintiff received a letter from an attorney about a foreclosure on the property and demanding that the indebtedness be brought current. Although the Plaintiff disputed the amount owed and/or that the Plaintiff was behind on her payments and/or in an effort to resolve the dispute without further cost and expense, the Plaintiff borrowed money and paid the amount that was claimed to be owed.

13. After making this payment and bringing the account current, the Property was immediately placed back into arrears although the Plaintiff would aver that this would not be possible. The Plaintiff was told by representatives of Green Tree that the money was placed into a "suspense account" for which the Plaintiff was not provided any explanation. Sometime, thereafter the indebtedness was assigned to Ditech.

*- Page 3 of 13 -*

EXHIBIT A

14. Upon information and belief, from that point forward and continuing forward to the date of the filing of this Complaint, the Plaintiff's payments were never properly be properly applied to her loan.

15. In particular, it appears that the Defendants and/or their predecessors and/or assignees in interest, miscalculated the principal, interest, late fees, and/or other charges that they assessed against the Plaintiff; and/or refused and/or failed to properly accept and apply all of the payments that the Plaintiff made on the mortgage loan; and/or refused and/or failed to cure the problems with the billing on the loan; and/or by issuing inappropriate or unwarranted charges against the Plaintiff.

16. As a result Ditech is now claiming a current balance owed in excess of $9,000.00 and apparently has instituted foreclosure proceedings against the Property.

17. It should also be noted that the Plaintiff has not received any actual and/or proper notice of the foreclosure proceedings but upon information and belief Defendant Ditech has engaged the services of the Padgett Law Group to complete a foreclosure sale on March 7, 2019.

18. The Plaintiff would aver that there is a serious and substantial dispute as to the amounts owed to the Defendants and that the Court needs to determine and resolve these disputes through a declaratory order. Moreover, the Plaintiff would aver that there is an immediate threat of irreparable harm against her by these Defendants and/or their assignees, agents, and/or others acting on their behalf due to the threatened and/or actual foreclosure process(es) that apparently has already begun for which there would be no adequate remedy at law if the foreclosure process is not immediately stopped.

EXHIBIT A

## <u>FIRST CLAIM – BREACH OF CONTRACT</u>

20. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

21. This claim is for breach of contract against the Defendants.

22. The Plaintiff entered into mortgage loan agreement with the Defendants, both of which set forth dates by which monthly principal and interest payments were due as well as when late fees and other changes could be assessed.

23. The Plaintiff has duly performed all of the terms and conditions of the above-described mortgage loan agreement with Defendants to the extent that the Plaintiff can ascertain what is rightly and properly owed.

24. The terms and conditions of the Plaintiff's mortgage loan agreement with the Defendants required that the payments made by the Plaintiff be properly applied to said loan agreement.

25. The Defendants and/or their predecessors and/or assignees and/or agents breached the Plaintiff's mortgage loan agreement in one or more of the following respects:

    A. By miscalculating principal, interest, late fees, and/or other charges that they assessed against the Plaintiff; and/or

    B. By refusing and/or otherwise failing to accept and apply all of the payments and/or credits that the Plaintiff made or had on the mortgage loan, the result of which has led to the commencement of the process of foreclosure against the Property; and/or

EXHIBIT A .

C. By refusing and/or failing to cure the problems with the calculation of amounts owed on the mortgage; and/or

D. By issuing inappropriate or unwarranted charges against the Plaintiff; and/or

E. By not properly allowing the grace period.

26. As a sole, direct, and proximate cause of the Defendants' actions and/or omissions constituting a breach of contract, the Plaintiff has and continues to incur substantial damages.

## SECOND CLAIM – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

27. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

28. This claim is for breach of the implied covenant of good faith and fair dealing against the Defendants.

29. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. The implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of his or her agreement. This covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the agreement to accomplish its purpose. This covenant protects the benefits of the agreement the parties reasonably contemplated when they entered into the contract.

EXHIBIT A

30. The Defendants did not deal fairly with the Plaintiff in connection with the mortgage loan agreement when they refused or otherwise failed to properly accept and apply payments to the parties' mortgage loan agreements and thereafter began foreclosure proceedings against the Property. Moreover, the Defendants ultimately refused to resolve their mistakes with the Plaintiff in an equitable fashion.

31. The Defendants enjoyed substantial discretionary power affecting the rights of the Plaintiff during the events alleged in this Complaint and were required to exercise such substantial discretionary power in good faith.

32. The Defendants engaged in such conduct to drive the Plaintiff into foreclosure so that they could acquire the Property. These actions were a bad faith breach of contract between the Plaintiff and Defendants, which show that said Defendants had no intentions whatsoever of performing the mortgage loan agreement in good faith.

33. As a sole, direct, and proximate cause of the Defendants actions and/or omissions amounting to a breach of the implied covenant of good faith and fair dealing, the Plaintiff has and continues to incur substantial damages.

### THIRD CLAIM – FRAUD AND/OR MISREPRESENTATION

34. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

35. This claim is for fraud and/or misrepresentation against the Defendants.

EXHIBIT A

36. The Defendants and/or their predecessors, assignees, employees, agents, representatives, or other individuals working on their behalf, engaged in fraud and/or misrepresentation when they falsely represented to the Plaintiff that they would properly credit payments made by the Plaintiff on the mortgage loans when, in fact, they have refused and/or otherwise failed to accept and apply all of the payments that the Plaintiff made on the mortgage loans and/or duly apply all appropriate credits, the result of which has lead to the commencement of the process of foreclosure against the Property.

37. The Defendants and/or their predecessors, assignees, employees, agents, representatives, or other individuals working on their behalf, engaged in fraud and/or misrepresentation when they falsely represented to the Plaintiff that they would properly calculate and/or correct errors regarding principal, interest, late fees, and/or other charges that they assessed against the Plaintiff when, in fact, they have refused and/or otherwise failed to make said corrections to the Plaintiff's mortgage loan agreement.

38. The Defendants' actions were intentional, willful, malicious, and/or reckless and entitle the Plaintiff to punitive damages. The Defendants knew of the foregoing falsehoods and made them recklessly with the intent to deceive the Plaintiff and to induce her into entering into mortgage loan agreement, to foreclose on the Property and/or to damage the Plaintiff's credit rating from said foreclosure.

39. Alternatively, the Defendants' actions and/or omissions were negligent in that the Defendants failed to exercise due care to maintain proper and accurate mortgage loan records and should have reasonably foreseen that their herein-stated actions and/or omissions of not crediting payments made by the Plaintiff and/or properly managing and/or assigning her account would harm or damage said Plaintiff financially.

EXHIBIT A

40. As a sole, direct, and proximate cause of the Defendants' actions and/or omissions, the Plaintiff has and continues to incur substantial damages.

## FOURTH CLAIM – OTHER INTENTIONAL, RECKLESS, AND/OR NEGLIGENT ACTIONS AND/OR OMISSIONS

41. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

42. At all times relevant herein, the Defendants as the Plaintiff's lenders and loan servicers had a duty to exercise reasonable care and skill to maintain proper and accurate mortgage loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting, and servicing of loan records including, but not limited to, acceptance of and accurate crediting of the Plaintiffs' monthly mortgage payments.

43. In taking the aforementioned actions and in failing to take the actions as the Plaintiff asserts should have been taken, the Defendants breached their duty of care and skill to the Plaintiff in the servicing of the Plaintiff's mortgage loan by failing to accept and properly and accurately credit the Plaintiff's monthly mortgage payments and by commencing foreclosure proceedings against the Property.

44. In fact, the Plaintiff would further aver that the Defendants acted intentionally, recklessly, and/or negligently incidental to their representation to the Plaintiff that they would properly credit payments made by the Plaintiff on the mortgage loan; properly calculate and/or correct errors regarding principal, interest, late fees, and/or other charges that they assessed against the Plaintiff.

EXHIBIT A

45. As a direct and proximate result of the Defendants' other intentional, reckless, and/or negligent actions and/or omissions, the Plaintiff has and continues to incur substantial damages.

## JURY DEMAND

The Plaintiff demands a trial by jury on all issues which may be determined by a jury.

**WHEREFORE, PREMISES CONSIDERED, your Plaintiff prays:**

1. That proper process be issued and served upon the Defendants, requiring them to answer this Complaint within the time allotted by the Tennessee Rules of Civil Procedure.

2. That this Court issue a declaration of the rights and duties of the parties, especially and specifically that the Court determine the proper amounts that may be owed to the Defendants by the Plaintiff.

3. That this Court temporarily restrain and permanently enjoin the Defendants' foreclosure of the Property and/or order the Defendants' to cease all efforts to foreclose on all of the Plaintiff's real estate involved in this civil action.

4. That this Court vacate and set aside any foreclosure sale executed by the Defendants against the Property.

5. That the Plaintiff be awarded a compensatory judgment against the Defendants, jointly and severally, in an amount of not less than $50,000.00, or an amount to be more specifically proven either before or at trial.

EXHIBIT A

6. That the Plaintiff be awarded a judgment against the Defendants, jointly and severally, for punitive damages.

7. That the Plaintiff be awarded the court costs and other expenses of this action.

8. That the Plaintiff be awarded such other and further relief to which she may be entitled by law.

THIS IS THE FIRST APPLICATION FOR EXTRAORDINARY RELIEF IN THIS MATTER; NO OTHER CHANCELLOR OR JUDGE HAS REFUSED THE RELIEF SOUGHT.

Respectfully submitted,

SNIDER & HORNER, PLLC

KEVIN A. SNIDER (B.P.R. #18231)
Attorney for the Plaintiff
Corporate Gardens
9056 Stone Walk Place
Germantown, TN 38138
(901) 751-3777

EXHIBIT A

*- Page 11 of 13 -*

## **AFFIDAVIT**

STATE OF TENNESSEE
COUNTY OF SHELBY

I, Julie Mulanax, having been duly sworn, state as follows:

1. I have reviewed the allegations of this Complaint and they are true and correct

to the best of my knowledge, information, and belief.

FURTHER AFFIANTS SAYETH NOT.

_____
JULIE MULANAX

Sworn and subscribed to me on this ___ day of _____ March _____, 2019.

_____
NOTARY PUBLIC

My Commission Expires: 12/6/2021

*- Page 12 of 13 -*

EXHIBIT A

## FIAT

TO THE CLERK OF THE THIS COURT:

    1. After the Plaintiff posts a bond in the amount of $ _____ 500⁰⁰ _____ ,

please issue and enter a Temporary Restraining Order, immediately restraining the

Defendants, their assignees, agents, servants, employees and attorneys and all persons in

active concert and participation with them from all efforts to collect any alleged unpaid

debt from the Plaintiff and from any and all foreclosure proceedings against the

Plaintiff's real property at 1194 Wingfield Road in Memphis, Tennessee.

    2. Please set the matter of a temporary injunction for hearing on the 18ᵗʰ day of

_March_____ , 2019 at ___10:00___ o'clock _____ am / pm.


                                **JoeDae L. Jenkins**
                                _____
                                CHANCELLOR

A TRUE COPY-ATTEST
Donna L. Russell, Clerk & Master
By _____ D.C. & M.

Date: ___3/5/___ , 2019
         1:10 pm

EXHIBIT A

*- Page 13 of 13 -*

Exhibit A

| | State of ~~Tennessee~~ MS |
| | County of ~~Shelby~~ DESOTO |
| | The actual consideration or value, whichever is greater, for this transfer is $69,000.00 |
| | Affiant |
| Prepared By and Return To: | Subscribed and sworn to before me, this the 30th day of May, 2007. |
| Law Offices of Shannon H. Williams | |
| 5960 Getwell Road, Suite 212 | Notary Public |
| Southaven, MS  38672 | My commission expires: 7-2-2010 |
| Phone: 662-895-9000 | (AFFIX SEAL) |

**THIS INSTRUMENT WAS PREPARED BY**
Griffin, Clift, Everton and Thornton, PLLC
6489 Quail Hollow, Suite 100 , Memphis, Tennessee 38120
File No. FF15686

MY COMMISSION EXPIRES
July 2, 2010

| Address of New Owner(s) as follows: Julie Rene Mulanax | Send Tax Bills To: | Map-Parcel Numbers 053-057-0020 |
| | Quicken Loans, Inc. | |
| 1194 Wingfield Street | P.O. Box 553154 | |
| Memphis, TN 38122 | Detroit, MI   48255-3154 | |

## WARRANTY DEED

FOR AND IN CONSIDERATION OF THE SUM OF TEN DOLLARS, CASH IN HAND PAID BY THE HEREINAFTER NAMED GRANTEES, AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, WE,

**George Arthur Parks and Jean Parks Burk, son and mother**

HEREINAFTER CALLED THE GRANTORS, HAVE BARGAINED AND SOLD, AND BY THESE PRESENTS DO TRANSFER AND CONVEY UNTO

**Julie Rene Mulanax, an unmarried person**

HEREINAFTER CALLED THE GRANTEES, THEIR HEIRS AND ASSIGNS, A CERTAIN TRACT OR PARCEL OF LAND IN Shelby COUNTY, STATE OF TENNESSEE, DESCRIBED AS FOLLOWS, TO-WIT:

Lot 36, Shirley Manor Subdivision, as shown on plat of record in Plat Book 14, Page 67, in the Register's Office of Shelby County, Tennessee, to which plat reference is hereby made for a more particular description of said property.

Being the same property conveyed to the Grantors herein by Warranty Deed of record at Instrument Number FA 9365 in the Register's Office of Shelby County, Tennessee.

This conveyance is made subject to Subdivision Restrictions, Building Lines and Easements of record in Plat Book 14, Page 67 and Protective Covenants in Book 2497, Page 617 and Book 2497, Page 619 all in said Register's Office and 2007 Shelby County Realty taxes, not yet due and payable.

This is improved (_xx_) Unimproved (____) property, known as 1194 Wingfield Street, Memphis, TN 38122

TO HAVE AND TO HOLD the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said GRANTEES that we are lawfully seized and possessed of said land in fee simple, have a good right to convey it and the same is unencumbered, unless otherwise herein set out; and we do further covenant and bind ourselves, our heirs and representatives, to warrant and forever defend the title to the said land to the said GRANTEES, their heirs and assigns, against the lawful claims of all persons whomsoever.  Wherever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

Witness my/our hand(s) this 30th day of May, 2007.

George Arthur Parks

Jean Parks Burk

EXHIBIT A

**INDIVIDUAL**
**STATE OF TENNESSEE     )**
**COUNTY OF        Shelby    )**

Before me, the undersigned, a Notary Public of said County and State, personally appeared George Arthur Parks and Jean Parks Burk, the within named seller, with whom I am personally acquainted(or proved to me on the basis of satisfactory evidence), and who acknowledged that he/she executed the within instrument for the purposes therein contained.

Witness my hand, at office, this 30th day of May, 2007.

_____
Notary Public

My Commission Expires: 08/30/08

EXHIBIT A



# *Tom Leatherwood*

## Shelby County Register

As evidenced by the instrument number shown below, this document
has been recorded as a permanent record in the archives of the
Office of the Shelby County Register.



160 N. Main St., Suite 519 ~ Memphis, Tennessee 38103 ~ (901) 545-4366
http://register.shelby.tn.us

EXHIBIT A

Prepared by and Return to:
Law Offices of Shannon H. Williams
5960 Getwell Rd., Ste. 212-B
Southaven, MS 38672
662-895-9000

Return To:
Christie Holloway
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI 48152


Exhibit B

Prepared By:

Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI 48152

The Maximum Principal Indebtedness for Tennessee recording tax purposes is $69,000.00    .

————————————————[Space Above This Line For Recording Data]————————————————

3211564428

# DEED OF TRUST

MIN 100039032115644284

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    May 30, 2007    ,
together with all Riders to this document.
**(B) "Borrower"** is Julie Rene Mulanax, a single woman

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is Quicken Loans Inc.

Lender is a    Corporation
organized and existing under the laws of    the State of Michigan

TENNESSEE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3043 1/01

-6A(TN) (0005)    1492391057
Page 1 of 15    Initials: _JEM_
VMP MORTGAGE FORMS - (800)521-7291

q03211564428 0233 163 0115

EXHIBIT A

3211564428
Lender's address is 20555 Victor Parkway, Livonia, MI  48152

(D) "Trustee"is Joseph B. Pitt, Jr.

a resident of Nashville                                                                                    , Tennessee.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-20216, tel. (888) 679-MERS.
(F) "Note"means the promissory note signed by Borrower and dated        May 30, 2007
The Note states that Borrower owes LenderSixty Nine Thousand and 00/100
                                                                                               Dollars
(U.S. $ 69,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than        June 1, 2037        . The maximum
principal indebtedness for Tennessee recording tax purposes is $  69,000.00        .
(G) "Property"means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders"means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |

Legal Attached

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions. .
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(TN) (0005)                           Page 2 of 15                    Initials: _JEM_        Form 3043  1/01

3211564428

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (a) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (b) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Shelby | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

### Derivation Clause

This instrument constituting the source of the Borrower's interest in the foregoing described property was a **Warranty** deed recorded **#** see legal description **# Simultaneously** in the Register's Office of Shelby County, Tennessee.

Parcel ID Number: 05035700020 which currently has the address of
1194 Wingfield Rd [Street]
Memphis [City], Tennessee 38122-1622 [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD, the aforedescribed property, together with all the hereditaments and appurtenances thereunto belonging to, or in anywise appertaining, unto the Trustee, its successors in trust and assigns, in fee simple forever. Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

-6A(TN) (0005)          Page 3 of 15          Initial: *JEM*          Form 3043 1/01

EXHIBIT

3211564428

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due

-6A(TN) (0005)

Page 4 of 15

Initials: _JPM_

Form 3043 1/01

EXHIBIT 0521564428 0233 163 0415

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 07091885

3211564428

for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 07091885

3211564428

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

EXHIBIT

3211564428  0233  163  0615

Tom Leatherwood, Shelby County Register of Deeds: Instr. #07091885

3211564428

work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there

 -6A(TN) (0005)

Page 7 of 15

Initials: JRM

Form 3043 1/01

EXHIBIT 3211564428 0233 163 0715

3211564428

is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

-6A(TN) (0005)                              Page 8 of 15                    Initials: _____           Form 3043  1/01

EXHIBIT

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 07091885

3211564428

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if

-6A(TN) (0005)                          Page 9 of 15                     Initials: ___     Form 3043  1/01

EXHIBIT

Tom Leatherwood, Shelby County Register of Deeds. Instr. # 07091885

3211564428

acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.



-6A(TN) (0005)                          Page 10 of 16                          Initials: _____          Form 3043   1/01

EXH...

3211564428

There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

EXH

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 07091885

3211564428

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

EXHIBIT 3211564428   0233  163  1215

3211564428

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by Applicable Law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in Section 15. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant at will of the purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Waivers.** Borrower waives all right of homestead, equity of redemption, statutory right of redemption and relinquishes all other rights and exemptions of every kind, including, but not limited to, a statutory right to an elective share in the Property.

-6A(TN) (0005)                   Page 13 of 15            Initials: _____            Form 3043  1/01

3211564428

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has executed this Security Instrument.

Witnesses:

_____

_____                     _Julie Rene' Mulanax_05/30/2007_ (Seal)
                                                    Julie Rene Mulanax                    -Borrower


_____

_____                     _____ (Seal)
                                                                                         -Borrower


_____ (Seal)                      _____ (Seal)
                        -Borrower                                                        -Borrower


_____ (Seal)                      _____ (Seal)
                        -Borrower                                                        -Borrower


_____ (Seal)                      _____ (Seal)
                        -Borrower                                                        -Borrower

EXH

3211564428
STATE OF ~~TENNESSEE~~, US          ~~Shelby~~          County ss: DESOTO

    On this     30th     day of          May, 2007          , before me personally appeared
Julie Rene Mulanax, a single woman

to me known to be the person(s) described in and who executed the foregoing instrument, and who
acknowledged the execution of the same to be his/her/their free act and deed. Witness my hand and official
seal.

My Commission Expires:

7-2-2010

                                        Notary Public



MY COMMISSION EXPIRES.
July 2, 2010

VMP-6A(TN) (0005)                    Page 15 of 15                    Form 3043    1/01

q03211564428 0233 163 1515

EXHIBIT A

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 07091885

# EXHIBIT A

Lot 36, Shirley Manor Subdivision, as shown on plat of record in Plat Book 14, Page 67, in the Register's Office of Shelby County, Tennessee to which plat reference is hereby made for a more particular description of said property.

Property more commonly known as: 1194 Wingfield Street, Memphis, TN 38122.

EXHIBIT A



# *Tom Leatherwood*

## Shelby County Register

As evidenced by the instrument number shown below, this document

has been recorded as a permanent record in the archives of the

Office of the Shelby County Register.



EXHIBIT A

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

**JULIE RENE MULANAX,**

      **Plaintiff,**

**VS.**

      **Docket No. CH-19-0324**
      **Part III**
      **JURY DEMANDED**

**QUICKEN LOANS, INC., and**
**DITECH FINANCIAL, LLC,**

      **Defendants.**

## ORDER CONTINUING TEMPOARY INJUNCTION HEARING

THIS MATTER came to be heard before this Honorable Court on March 18, 2019 for the Plaintiff's Temporary Injunction Hearing.  After statements from counsel for the Plaintiff, no objection by the Defendants, and upon the entire record as a whole, the Temporary Injunction Hearing was continued until Monday, April 8, 2019 at 2:00 p.m.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED.

                                    _____
                                    CHANCELLOR

                                    Date: _____

EXHIBIT A

APPROVED AS TO FORM:


_____
KEVIN A. SNIDER #18231
SNIDER & HORNER, PLLC
Attorney for the Plaintiff
Corporate Gardens
9056 Stone Walk Place
Germantown, TN 38138
(901) 751-3777



_____
HEATHER WRIGHT
Attorney for the Defendant Ditech Financial
1600 Division Street, Suite 700
Nashville, TN 38203
(615) 252-2342



_____
JAY EBELHAR
Attorney for the Defendant Quicken Loans
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
(901) 577-8204

*- Page 2 of 2 -*

EXHIBIT A

ELECTRONICALLY FILED
2019 Apr 01 1:25 PM
CLERK OF COURT

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| JULIE RENE MULANAX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. CH-19-0324-III |
| QUICKEN LOANS, INC., and DITECH | ) | |
| FINANCIAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

**NOTICE OF BANKRUPTCY FILING AND IMPOSITION OF AUTOMATIC STAY**

Defendant and debtor, Green Tree Servicing LLC, now known as Ditech Financial LLC (the **Debtor**), by and through its undersigned counsel, in accordance with and consistent with section 362(a) of the United States Bankruptcy Code, 1 U.S.C. §§ 101, *et seq.* (the **Bankruptcy Code**), respectfully submits this Notice of Bankruptcy and Imposition of Automatic Stay, and states as follows:

PLEASE TAKE NOTICE that on February 11, 2019, (the "**Commencement Date**"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), each commenced a voluntary case (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*) (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The Chapter 11 Cases are being jointly administered under Case No. 19-10412 (JLG). A copy of the applicable Debtor's chapter 11 petition is attached hereto as **Exhibit A**.

PLEASE BE ADVISED that pursuant to section 362(a) of the Bankruptcy Code (the "**Automatic Stay**"), the filing of a bankruptcy petition "operates as a stay, applicable to all

1

EXHIBIT A

entities," of, among other things "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the [bankruptcy] case" and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1), (3).

PLEASE BE FURTHER ADVISED that on February 13, 2019, upon the Debtors' motion, the Bankruptcy Court entered an interim order granting, among other things, the Debtors' motion for limited relief from the automatic stay to permit non-Debtor parties to assert and prosecute claims, cross-claims, third-party claims and counter-claims and raise certain defenses on a limited basis as described in the order (the "**Interim Order**").

PLEASE BE FURTHER ADVISED that on March 20, 2019, the Bankruptcy Court entered an order clarifying and granting such relief on a final basis (the "**Limited Stay Modification Order**"). Paragraphs 16-22 of the Limited Stay Modification Order identify the categories of defenses, claims and counter-claims for which the automatic stay has been lifted (the "**Permitted Claims**"). A copy of the Limited Stay Modification Order is attached hereto as **Exhibit B**.

PLEASE BE FURTHER ADVISED that to the extent that defenses, claims and counter-claims do not constitute Permitted Claims, they are subject to the automatic stay and the continued prosecution of those claims is prohibited.

PLEASE BE FURTHER ADVISED that Debtor's position is that in this matter, Plaintiff's request for declaratory relief, to the extent construed as a separate claim, is a Permitted Claim and may proceed to the extent it does not have an adverse effect on any of the Debtors' assets. The

EXHIBIT A

remainder of Plaintiff's claims for damages stemming from her causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and/or misrepresentation, and other intentional, reckless, and/or negligent actions and/or omissions do **not** constitute Permitted Claims, they remain subject to the automatic stay and the continued prosecution of these claims is prohibited. In addition, future claims, counter-claims, or defenses may be subject to the automatic stay. For convenience, to avoid prejudice, or to expedite and economize, the Permitted Claims may proceed separately from any other claim that is stayed by the Bankruptcy Code.

PLEASE BE FURTHER ADVISED that any action taken by the Plaintiff or any other party against the Debtor without obtaining relief from the Bankruptcy Court from the automatic stay may be void *ab initio* and may result in a finding of contempt by the Bankruptcy Court against Plaintiff or such other party. The Debtor reserves and retains all rights to seek relief in Bankruptcy Court from any action, judgment, order, or ruling entered in violation of the automatic stay.

PLEASE BE FURTHER ADVISED that pursuant to paragraphs 18, 19(h), and 22 of the Limited Stay Modification Order, any dispute regarding the extent, application and/or effect of the automatic stay under the Limited Stay Modification Order must be heard and determined in the Bankruptcy Court, jointly administered under Case No. 19-10412, and such other and further orders as may be entered by the Bankruptcy Court.

DATED this 1st day of April, 2019.

3

EXHIBIT A

Respectfully submitted,

Heather Howell Wright (BPR No. 30649)
Benjamin William Perry (BPR No. 34387)
BRADLEY ARANT BOULT CUMMINGS LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: (615) 252-3515
F: (615) 252-6364
Email: hwright@bradley.com
Email: bperry@bradley.com

*Attorneys for Defendant Ditech Financial LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and exact copies of the foregoing have been served upon the following through the Court's Electronic Filing System, or by mailing the same to the offices of said counsel by United States Mail, postage prepaid this 1st day of April, 2019.

Kevin A. Snider
Snider & Horner, PLLC
Corporate Gardens
9056 Stone Walk Place
Germantown, TN  38138

*Attorney for Plaintiff*

Benjamin W. Perry

4

EXHIBIT A

ELECTRONICALLY FILED
2019 Apr 01 1:46 PM
CLERK OF COURT

**Fill in this information to identify the case**

United States Bankruptcy Court for the:

Southern _____ District of   New York _____
                                              (State)

Case number (*If known*): _____   Chapter   11 _____

☐   Check if this is an amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy        04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| **1.** | **Debtor's name** | Ditech Financial LLC |

| | | |
|---|---|---|
| **2.** | **All other names debtor used in the last 8 years** | Green Tree Servicing LLC |
| | | Ditech |
| | Include any assumed names, trade names, and *doing business as* names | |

| | | |
|---|---|---|
| **3.** | **Debtor's federal Employer Identification Number (EIN)** | 41-1795868 |

**4.  Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 1100        Virginia Drive | 3000        Bayport Drive, Suite 985 |
| Number      Street | Number      Street |
| Suite 100A | |
| | P.O. Box |
| Fort Washington   Pennsylvania   19034 | Tampa        Florida        33607 |
| City        State        ZIP Code | City        State        ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| Montgomery County | |
| County | |
| | Number        Street |
| | |
| | City        State        ZIP Code |

| | | |
|---|---|---|
| **5.** | **Debtor's website (URL)** | www.ditech.com |

| | | |
|---|---|---|
| **6.** | **Type of debtor** | ☒  Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐  Partnership (excluding LLP) |
| | | ☐  Other.  Specify: _____ |



EXHIBIT A

| Debtor | Ditech Financial LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Railroad (as defined in 11 U.S.C. § 101(44))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
☒ None of the above

B. *Check all that apply:*

☐ Tax- entity (as described in 26 U.S.C. § 501)
☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes .

5222

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7
☐ Chapter 9
☒ Chapter 11. *Check all that apply:*

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No
☐ Yes   District _____ When _____ Case number _____
                               MM/ DD/ YYYY
            District _____ When _____ Case number _____
                                MM/ DD/ YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No
☒ Yes   Debtor   See attached Schedule 1   Relationship _____
        District   Southern District of New York   When   February 11, 2019
        Case number, if known _____   MM / DD/ YYYY

EXHIBIT A

| Debtor | Ditech Financial LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**11. Why is the case filed in this district?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
    What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**    _____

| Number | Street | | |
|---|---|---|---|
| City | | State | ZIP Code |

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

        Contact Name _____

        Phone _____

---

### Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

(on a consolidated basis)

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☒ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

(on a consolidated basis)

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☒ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

(on a consolidated basis)

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☒ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

EXHIBIT A

Debtor    Ditech Financial LLC                                      Case number (if known) _____
          _____
          Name

| | |
|---|---|
| ■ | **Request for Relief, Declaration, and Signatures** |

**WARNING** — Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

▥ The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

▥ I have been authorized to file this petition on behalf of the debtor.

▥ I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  February 11, 2019
             MM/ DD /YYYY

✘  /s/ Kimberly Perez                        Kimberly Perez
   _____        _____
   Signature of authorized representative of    Printed name
   debtor

   Senior Vice President and Chief
   Accounting Officer
   _____
   Title

**18. Signature of attorney**

✘  /s/ Ray C. Schrock, P.C.                   Date  February 11, 2019
   _____          _____
   Signature of attorney for debtor                 MM / DD / YYYY

   Ray C. Schrock, P.C.
   _____
   Printed Name

   Weil, Gotshal & Manges LLP
   _____
   Firm Name

   767 Fifth Avenue
   _____
   Number        Street

   New York                                   New York                  10153
   _____          _____       _____
   City                                       State                     ZIP Code

   (212) 310–8000                             ray.schrock@weil.com
   _____          _____
   Contact phone                              Email address

   4860631                                    New York
   _____          _____
   Bar Number                                 State

EXHIBIT A

**Schedule 1**

Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the affiliated entities listed below, including the debtor in this chapter 11 case, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the **"Court"**).  A motion will be filed with the Court requesting that the chapter 11 cases of the entities listed below be consolidated for procedural purposes only and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

| COMPANY | CASE NUMBER | DATE FILED | DISTRICT | JUDGE |
|---|---|---|---|---|
| Green Tree Credit LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Ditech Holding Corporation | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| DF Insurance Agency LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Ditech Financial LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Green Tree Credit Solutions LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Green Tree Insurance Agency of Nevada, Inc. | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Green Tree Investment Holdings III LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Green Tree Servicing Corp. | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Marix Servicing LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Mortgage Asset Systems, LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| REO Management Solutions, LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Reverse Mortgage Solutions, Inc. | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Walter Management Holding Company LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |
| Walter Reverse Acquisition LLC | 19-_____( ) | February 11, 2019 | S.D.N.Y. | Pending |

EXHIBIT A

**Exhibit A**

**Resolutions of the Board of Directors**

EXHIBIT A

# RESOLUTIONS OF THE
# THE BOARD OF DIRECTORS OF
# DITECH HOLDING CORPORATION

## February 10, 2019

**WHEREAS**, Ditech Holding Corporation (the "Company"), with the assistance of financial and legal advisors, has been conducting a review of strategic alternatives, including the potential sale of the Company, a sale of all or a portion of the Company's assets, and/or a recapitalization of the Company;

**WHEREAS**, the Board of Directors (the "Board") of the Company previously established a special committee of the Board composed of independent and disinterested directors (the "Special Committee") to assist management of the Company in evaluating, exploring and negotiating strategic alternatives, and recommending to the Board whether to approve any such potential transaction;

**WHEREAS**, upon recommendation of the Special Committee, the Board previously approved the form, terms and provisions of, and the execution, delivery, and performance of, and, on February 8, 2019, the Company entered into, the restructuring support agreement (the "RSA") with an ad hoc group of lenders (the "Term Loan Lenders") holding more than 75% of the aggregate total principal amount of the Company's senior secured first lien term loan, borrowed pursuant to the Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, supplemented or otherwise modified, the "Credit Agreement") establishing the Term Loan Lenders' support for a prearranged chapter 11 plan of reorganization;

**WHEREAS**, upon recommendation of the Special Committee, the Board previously approved, and on February 8, 2019, the Company entered into, the Commitment Letter (the "Commitment Letter"), by and among the Company as Guarantor, its wholly-owned direct subsidiaries Reverse Mortgage Solutions, Inc. ("RMS") and Ditech Financial LLC ("Ditech") as Sellers, Barclays Bank PLC ("Barclays") as Administrative Agent and as Buyer and Nomura Corporate Funding Americas, LLC ("Nomura") as Buyer (together with Barclays in its capacity as Buyer, the "Buyers"), pursuant to which the Buyers committed to provide new debtor-in-possession financing in an amount of up to $1.9 billion on terms and subject to conditions set forth in the Commitment Letter and the term sheet attached thereto;

**WHEREAS**, the Board has met on various occasions to review and has had the opportunity to ask questions about the materials presented by the management and the legal and financial advisors of the Company regarding the liabilities and liquidity of the Company, the strategic alternatives available to it and the impact of the foregoing on the Company's business; and

**WHEREAS**, in connection therewith, the Board desires to approve the following resolutions.

EXHIBIT A

**NOW, THEREFORE, BE IT HEREBY**

**Commencement of Chapter 11 Cases**

       **RESOLVED**, that, upon recommendation of the Special Committee, the Board has determined, after consultation with the management and the legal and financial advisors of the Company, that it is desirable and in the best interests of the Company, its creditors, and other parties in interest to approve and authorize the filing of petitions by the Company and certain of its subsidiaries, including RMS and Ditech, seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and be it further

       **RESOLVED**, that upon recommendation of the Special Committee, the Board has determined, after consultation with the management and the legal and financial advisors of the Company, that it is desirable and in the best interests of the Company, its creditors, and other parties in interest that the Company and its advisors prepare, finalize and file, as appropriate, the prearranged chapter 11 plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") consistent with the terms of the RSA;

       **RESOLVED**, that any officer of the Company (each, an "Authorized Officer"), in each case, acting singly or jointly, be, and each hereby is, authorized, empowered, and directed to execute and file in the name and on behalf of the Company all petitions, schedules, motions, lists, applications, pleadings, and other papers in the Bankruptcy Court, and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, investment bankers and other professionals, and to take and perform any and all further acts and deeds which such Authorized Officer deems necessary, proper, or desirable in connection with the chapter 11 cases (the "Chapter 11 Cases"), the Plan and the Disclosure Statement, including, without limitation, negotiating, executing, delivering and performing any and all documents, agreements, certificates and/or instruments in connection with the transactions and professional retentions set forth in these resolutions, with a view to the successful prosecution of the Chapter 11 Cases; and be it further

**Debtor-in-Possession Financing**

       **RESOLVED**, that in connection with the Chapter 11 Cases, and as previously authorized and agreed to by Ditech and RMS in connection with the Commitment Letter, and upon recommendation of the Special Committee, it is in the best interest of the Company, Ditech, RMS, RMS REO CS, LLC ("RMS REO CS"), RMS REO BRC, LLC ("RMS REO BRC") and RMS REO BRC II, LLC ("RMS REO BRC II") to engage in, and the Company, Ditech, RMS, RMS REO CS, RMS REO BRC and RMS REO BRC II will obtain benefits from, the financing transactions contemplated by the agreements listed on <u>Schedule A</u> hereto and any and all of the other agreements, including, without limitation, any other guarantees, certificates, documents and instruments authorized, executed, delivered, reaffirmed, verified and/or filed in connection with the Debtor-in-Possession Financing (as defined below) (together with the transaction documents listed on <u>Schedule A</u>, collectively, the "DIP Financing Documents"), which, subject to the approval of the Bankruptcy Court, will provide the Company, Ditech, RMS and RMS REO BRC II up to $1.9 billion in available warehouse financing, which is necessary

EXHIBIT A

and appropriate for the conduct, promotion and attainment of the business of the Company and its subsidiaries, including Ditech, RMS and RMS REO BRC II (the "Debtor-in-Possession Financing") (capitalized terms used in this section with respect to Debtor-in-Possession Financing and not otherwise defined herein shall have the meanings ascribed to such terms in the Commitment Letter or the term sheet attached thereto); and be it further

   **RESOLVED**, that the Company's performance of its obligations under the DIP Financing Documents, including the borrowings and guarantees contemplated thereunder, are hereby, in all respects confirmed, ratified and approved; and be it further

   **RESOLVED**, that any Authorized Officer is hereby authorized, empowered and directed, in the name and on behalf of the Company, to cause the Company to negotiate and approve the terms, provisions of and performance of, and to prepare, execute and deliver the DIP Financing Documents, on substantially the same terms and conditions presented to the Board, in the name and on behalf of the Company under its corporate seal or otherwise, and such other documents, agreements, instruments and certificates as may be required by the Administrative Agent or required by the DIP Financing Documents; and be it further

   **RESOLVED**, that any Authorized Officer is hereby authorized, as part of the adequate protection to be provided to the lenders and administrative agent under the Credit Agreement, to grant replacement security interests in, and replacement liens on, any and all property of the Company as collateral pursuant to the Bankruptcy Court's orders to secure all of the obligations and liabilities of the Company thereunder, and to authorize, execute, verify, file and/or deliver to the administrative agent, on behalf of the Company, all agreements, documents and instruments required by the lenders or the administrative agent under the Credit Agreement in connection with the foregoing; and be it further

   **RESOLVED**, that any Authorized Officer is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to take all such further actions including, without limitation, to pay all fees and expenses, in accordance with the terms of the DIP Financing Documents, which shall, in such Authorized Officer's judgment, be necessary, proper or advisable to perform the Company's obligations under or in connection with the DIP Financing Documents and the transactions contemplated therein and to carry out fully the intent of the foregoing resolutions; and be it further

   **RESOLVED**, that any Authorized Officer is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the DIP Financing Documents which shall, in such Authorized Officer's sole judgment, be necessary, proper or advisable; and be it further

**Retention of Advisors**

   **RESOLVED**, that, upon recommendation of the Special Committee, in connection with the Chapter 11 Cases, any Authorized Officer, in each case, acting singly or jointly, be, and each hereby is, authorized, empowered, and directed, with full power of delegation, in the name and on behalf of the Company, to employ and retain all assistance by

EXHIBIT A

legal counsel, accountants, financial advisors, investment bankers and other professionals, on behalf of the Company, which such Authorized Officer deems necessary, appropriate or advisable in connection with, or in furtherance of, the Chapter 11 Cases, with a view to the successful prosecution of the Chapter 11 Cases (such acts to be conclusive evidence that such Authorized Officer deemed the same to meet such standard); and be it further

**RESOLVED**, that the firm of Houlihan Lokey Capital, Inc., located at 10250 Constellation Blvd., 5th Floor, Los Angeles, California 90067, is hereby retained as investment banker for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

**RESOLVED**, that the law firm of Weil, Gotshal & Manges LLP, located at 767 Fifth Avenue, New York, NY 10153, is hereby retained as counsel for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

**RESOLVED**, that the firm of AlixPartners, located at 909 Third Avenue, New York, New York 10022, is hereby retained as financial advisor for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

**RESOLVED**, that the firm of Epiq Corporate Restructuring, LLC, located at 777 Third Avenue, 12th Floor, New York, New York 10017, is hereby retained as claims, noticing, and solicitation agent and administrative advisor for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

**Approval of Actions of Subsidiaries**

**RESOLVED**, that in the judgment of the Board, it is desirable and in the best interests of certain of the Company's direct and indirect subsidiaries for each such entity or entities to take any and all action, including related to the DIP Financing Documents, Debtor-in-Possession Financing and filing in the Bankruptcy Court, and to execute and deliver all documents, agreements, motions and pleadings as are necessary, proper, or desirable to enable such subsidiary to carry out the DIP Financing Documents, Debtor-in-Possession Financing and filing in the Bankruptcy Court contemplated hereby, including granting any director, officer, or other authorized representative as applicable according to local law, the authority to take action in support thereof; and be it further

**General**

**RESOLVED,** that any Authorized Officer is hereby authorized, empowered and directed, in the name and on behalf of the Company, to cause the Company to enter into, execute, deliver, certify, file and/or record, perform and approve any necessary public disclosures and filings related to, such documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities and certificates as may be required in connection with the Chapter 11 Cases, DIP Financing Documents and Debtor-in-Possession Financing, and to take such other actions that in the judgment of the Authorized Officer shall be or become necessary, proper or desirable in connection therewith; and be it further

4

EXHIBIT A

   **RESOLVED**, that any actions taken by any Authorized Officer, for or on behalf of the Company, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Company.

EXHIBIT A

## Schedule A

1. Master Refinancing Agreement, dated as of the Closing Date, by and among Barclays, as administrative agent for the Buyers (as defined therein) and other Secured Parties (as defined therein), Barclays and Nomura, each as a Buyer (as defined therein), Barclays Capital Inc. and Nomura Securities International, Inc., each as an MSFTA Counterparty (as defined therein), Ditech and Reverse Mortgage Solutions, Inc., each as a Seller (as defined therein) and RMS REO BRC II, LLC, as REO Subsidiary (as defined therein) (the "Omnibus Agreement").

2. Master DIP Fee Letter, dated as of the Closing Date, among Barclays, as administrative agent, Barclays and Nomura, as Committed Buyers (as defined therein), Ditech, RMS and Ditech Holding Corporation.

3. Master DIP Guaranty, dated as of the Closing Date, made by Guarantor in favor of Barclays, as Administrative Agent, for the benefit of Buyers and the other Buyer Parties (as defined therein).

4. Margin, Setoff and Netting Agreement, dated as of the Closing Date, among Barclays, as Administrative Agent, Barclays Capital, Inc., Nomura Securities International, Inc., Nomura, Ditech, RMS, and RMS REO BRC II, LLC and acknowledged and agreed to by Ditech Holding Corporation.

5. Master Administration Agreement, dated as of the Closing Date, among Barclays, as Administrative Agent for the Buyers and other Secured Parties (as defined therein), Barclays and Nomura, each as a Buyer (as defined therein), Barclays Capital Inc. and Nomura Securities International, Inc., each as a MSFTA Counterparty (as defined therein), Ditech and RMS, each as a Seller (as defined therein), and RMS REO BRC II, LLC as REO Subsidiary (as defined therein).

6. Amended and Restated Master Repurchase Agreement, dated as of the Closing Date, by and among Barclays and Nomura, as Purchasers (as defined therein), Barclays, as Agent (as defined therein), RMS and RMS REO BRC II, LLC.

7. Amended and Restated Pricing Side Letter, dated as of the Closing Date, among Barclays, as Purchaser and Agent, Nomura, as Purchaser, RMS and RMS REO BRC II, LLC.

8. Assignment Agreement, dated as of the Closing Date, between RMS REO CS, LLC and RMS.

9. Assignment Agreement, dated as of the Closing Date, between RMS REO BRC, LLC and RMS.

10. Assignment Agreement, dated as of the Closing Date, between RMS REO BRC II, LLC and RMS.

EXHIBIT A

11. Amended and Restated Custodial Agreement, dated as of the Closing Date, by and among RMS REO BRC II, LLC (the "REO Subsidiary"), RMS, Deutsche Bank National Trust Company, as custodian for Purchasers (as defined therein) and for the REO Subsidiary, Barclays and Nomura, as Purchasers (as defined therein), and Barclays, as Agent (as defined therein).

12. Amended and Restated Deposit Account Control Agreement, dated as of the Closing Date, by and among RMS, Barclays, as Agent (as defined therein), and Wells Fargo Bank, National Association.

13. Amendment No. 1 to the Limited Liability Company Agreement of RMS REO BRC II, LLC, dated as of the Closing Date, entered into by RMS, as the sole member, RMS REO BRC II, LLC, and consented to by Barclays, as Agent.

14. Indenture, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Indenture"), by and among Ditech Agency Advance Trust, as issuer (the "Agency Facility Issuer"), Wells Fargo Bank, N.A. ("Wells Fargo"), as indenture trustee (in such capacity, the "Agency Facility Indenture Trustee"), calculation agent, paying agent and securities intermediary, Ditech, as administrator (in such capacity, the "Agency Facility Administrator") and as servicer (in such capacity, the "Agency Facility Servicer") and Barclays, as administrative agent (in such capacity, the "Agency Facility Administrative Agent") (successor to Credit Suisse First Boston Mortgage Capital LLC, as initial administrative agent).

15. Series 2019-VF1 Indenture Supplement to Agency Facility Indenture, dated as of the Closing Date, by and among the Agency Facility Issuer, the Agency Facility Indenture Trustee (as indenture trustee, calculation agent, paying agent and securities intermediary), the Agency Facility Administrator, the Agency Facility Servicer and the Agency Facility Administrative Agent.

16. Receivables Sale Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Receivables Sale Agreement"), by and among the Agency Facility Servicer, as servicer and as the receivables seller (in such capacity, the "Agency Facility Receivables Seller"), Ditech Agency Advance Depositor LLC, as depositor (the "Agency Facility Depositor") and the Company, as guarantor.

17. Amendment No.1 to the Agency Facility Receivables Sale Agreement, dated as of the Closing Date, by and among the Agency Facility Servicer, the Agency Facility Receivables Seller, the Agency Facility Depositor and the Company, as guarantor.

18. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Depositor and the Agency Facility Receivables Seller.

EXHIBIT A

19. Receivables Pooling Agreement, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Depositor and the Agency Facility Issuer.

20. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Depositor and the Agency Facility Issuer.

21. Administration Agreement, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Issuer and the Agency Facility Administrator.

22. Acknowledgment Agreement with Respect to Servicing Advance Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Acknowledgment Agreement"), by and among the Agency Facility Issuer, the Agency Facility Depositor, the Agency Facility Servicer, the Agency Facility Indenture Trustee, Fannie Mae and the Agency Facility Administrative Agent.

23. Amendment No. 1 to the Agency Facility Acknowledgment Agreement, dated as of April 20, 2018, by and among the Agency Facility Issuer, the Agency Facility Depositor, the Agency Facility Servicer, the Agency Facility Indenture Trustee, Fannie Mae and the Agency Facility Administrative Agent.

24. Amendment No. 2 to the Agency Facility Acknowledgment Agreement, dated as of the Closing Date, by and among the Agency Facility Issuer, the Agency Facility Depositor, the Agency Facility Servicer, the Agency Facility Indenture Trustee, Fannie Mae and the Agency Facility Administrative Agent.

25. Series 2019-VF1 Variable Funding Note Purchase Agreement, dated as of the Closing Date, (the "Agency Facility Note Purchase Agreement"), by and among Ditech, as the Agency Facility Servicer, the Agency Facility Administrator and the Agency Facility Receivables Seller, the Agency Facility Depositor, the Agency Facility Issuer, the Administrative Agent, and Barclays, as a Purchaser Agent ("Agency Facility Purchaser").

26. Ditech Agency Advance Trust Advance Receivables Backed Note, Series 2019-VF1 Note, Number 1 (the "Agency Facility Note"), dated as of the Closing Date, in the name of the Agency Facility Purchaser.

27. Amended and Restated Trust Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Trust Agreement"), by and among the Agency Facility Depositor, Wilmington Trust, National Association, as the owner trustee (in such capacity, the "Agency Facility Owner Trustee"), and the Agency Facility Administrator.

28. Amendment No.1 to the Agency Facility Trust Agreement, dated as of the Closing Date, by and among the Agency Facility Depositor, Wilmington Trust, National Association, the Agency Facility Owner Trustee and the Agency Facility Administrator.

EXHIBIT A

29. Amended and Restated Limited Liability Company Agreement of the Agency Facility Depositor (the "Agency Facility Depositor LLC Agreement"), dated as of February 9, 2018 and effective as of February 12, 2018, by and among Ditech, as the sole economic member of the Agency Facility Depositor and Albert Fioravanti, as the Special Member and Independent Manager of the Agency Facility Depositor.

30. Amendment No. 1 to the Agency Facility Depositor LLC Agreement, dated as of the Closing Date, made by Ditech, as the sole economic member of the Agency Facility Depositor and consented to by Albert Fioravanti, as the Special Member and Independent Manager of the Agency Facility Depositor and Barclays, as sole noteholder.

31. Indenture, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Indenture"), by and among Ditech PLS Advance Trust II, as issuer (the "PLS Facility Issuer"), Wells Fargo Bank, as indenture trustee (in such capacity, the "PLS Facility Indenture Trustee"), calculation agent, paying agent and securities intermediary, Ditech, as administrator (in such capacity, the "PLS Facility Administrator") and as servicer (in such capacity, the "PLS Facility Servicer") and Barclays, as administrative agent (in such capacity, the "PLS Facility Administrative Agent") (successor to Credit Suisse First Boston Mortgage Capital LLC, as initial administrative agent).

32. Series 2019-VF1 Indenture Supplement to PLS Facility Indenture, dated as of the Closing Date (the "PLS Facility Indenture Supplement"), by and among the PLS Facility Issuer, the PLS Facility Indenture Trustee (as indenture trustee, calculation agent, paying agent and securities intermediary), the PLS Facility Administrator, the PLS Facility Servicer and the PLS Facility Administrative Agent.

33. Receivables Sale Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Receivables Sale Agreement"), by and among the PLS Facility Servicer, as servicer and as the receivables seller (in such capacity, the "PLS Facility Receivables Seller"), Ditech PLS Advance Depositor LLC, as depositor (the "PLS Facility Depositor") and the Company, as guarantor.

34. Amendment No.1 to the PLS Facility Receivables Sale Agreement, dated as of the Closing Date, by and among the PLS Facility Servicer, the PLS Facility Receivables Seller, the PLS Facility Depositor and the Company, as guarantor ("PLS Facility Receivables Sale Agreement Amendment").

35. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (the "PLS Facility Assignment of Receivables"), by and between the PLS Facility Depositor and the PLS Facility Receivables Seller.

36. Receivables Pooling Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (the "PLS Facility Receivables Pooling Agreement"), by and between the PLS Facility Depositor and PLS Facility Issuer.

EXHIBIT A

37. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (the "Depositor PLS Facility Assignment of Receivables"), by and between the PLS Facility Depositor and the PLS Facility Issuer.

38. Administration Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (the "PLS Facility Administration Agreement"), by and between the PLS Facility Issuer and the PLS Facility Administrator.

39. Acknowledgment Agreement with Respect to Servicing Advance Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Acknowledgment Agreement"), by and among the PLS Facility Issuer, the PLS Facility Depositor, the PLS Facility Servicer, the PLS Facility Indenture Trustee, Fannie Mae and the PLS Facility Administrative Agent.

40. Series 2019-VF1 Variable Funding Note Purchase Agreement, dated as of the Closing Date, and effective as of the Effective Date (the "PLS Facility Note Purchase Agreement"), by and among Ditech, as the PLS Facility Servicer, the PLS Facility Administrator and the PLS Facility Receivables Seller, the PLS Facility Depositor, the PLS Facility Issuer, the Administrative Agent, and Barclays, as a Purchaser Agent ("PLS Facility Purchaser").

41. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class A-VF1 Note Number 1 (the "PLS Facility Note, Class A"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

42. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class B-VF1 Note Number 1 (the "PLS Facility Note, Class B"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

43. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class C-VF1 Note Number 1 (the "PLS Facility Note, Class C"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

44. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class D-VF1 Note Number 1 (the "PLS Facility Note, Class D"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

45. Amended and Restated Trust Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Trust Agreement"), by and among the PLS Facility Depositor, Wilmington Trust, National Association, as the owner trustee (in such capacity, the "PLS Facility Owner Trustee"), and the PLS Facility Administrator.

46. Amendment No.1 to the PLS Facility Trust Agreement, dated as of the Closing Date, by and among the Agency Facility Depositor, the Agency Facility Owner Trustee and the Agency Facility Administrator.

EXHIBIT A

47. Amended and Restated Limited Liability Company Agreement of the PLS Facility Depositor (the "PLS Facility Depositor LLC Agreement"), dated as of February 9, 2018 and effective as of February 12, 2018, by and among Ditech, as the sole economic member of the PLS Facility Depositor and Albert Fioravanti, as the Special Member and Independent Manager of the PLS Facility Depositor.

48. Amendment No. 1 to the PLS Facility Depositor LLC Agreement, dated as of the Closing Date, made by Ditech, as the sole economic member of the PLS Facility Depositor and consented to by Albert Fioravanti, as the Special Member and Independent Manager of the PLS Facility Depositor and Barclays, as sole noteholder.

49. Pledge Agreement, dated as of the Closing Date, made by the Ditech in favor of Barclays.

50. Master Repurchase Agreement, dated as of the Closing Date, by and among Barclays, as Administrative Agent on behalf of Buyers (as defined therein), Barclays and Nomura, as Buyers (as defined therein), other Buyers party thereto from time to time, and Ditech.

51. Pricing Side Letter, dated the Closing Date, among Barclays, as Administrative Agent for the benefit of Buyers (as defined therein), Barclays and Nomura, as Committed Buyers (as defined therein), and Ditech.

52. Power of Attorney, dated as of the Closing Date, to be entered into by Ditech.

53. Custodial and Disbursement Agreement, dated as of the Closing Date, by and among Barclays and Nomura, as Buyers (as defined therein), Ditech, Barclays, as agent of the Buyers, and Wells Fargo Bank, N.A.

54. Amended and Restated Deposit Account Control Agreement, dated as of the Closing Date, by and among Barclays, as Administrative Agent (as defined therein), Ditech and U.S. Bank National Association.

55. Second Amendment to the Master Securities Forward Transaction Agreement, dated as of the Closing Date, between Barclays Capital Inc. and Ditech.

56. Second Amendment to the Master Securities Forward Transaction Agreement, dated as of the Closing Date, between Nomura Securities International, Inc. and Ditech.

EXHIBIT A

**ACTION BY**
**WRITTEN CONSENT OF**
**THE GOVERNING BODIES OF**

DF INSURANCE AGENCY LLC
DITECH FINANCIAL LLC
GREEN TREE CREDIT LLC
GREEN TREE CREDIT SOLUTIONS LLC
GREEN TREE INSURANCE AGENCY OF NEVADA, INC.
GREEN TREE INVESTMENT HOLDINGS III LLC
GREEN TREE SERVICING CORP.
MARIX SERVICING LLC
MORTGAGE ASSET SYSTEMS, LLC
REO MANAGEMENT SOLUTIONS, LLC
REVERSE MORTGAGE SOLUTIONS, INC.
WALTER MANAGEMENT HOLDING COMPANY LLC
WALTER REVERSE ACQUISITION LLC

February 10, 2019

The required members of the board of directors, the sole member, the managing member, the sole manager or the sole general partner, as the case may be (as applicable, the "Governing Body"), of each of the entities referenced above (each, a "Company" and collectively, the "Companies"), do hereby consent to, adopt, and approve, by written consent in accordance with applicable law, the following resolutions and every action effected thereby:

**WHEREAS**, each Company is a direct or indirect wholly-owned subsidiary of Ditech Holding Corporation (the "Parent");

**WHEREAS**, Reverse Mortgage Solutions, Inc. is the sole "member" (as such term is used in the Delaware Limited Liability Company Act, 6 Del.C. § 18-101, et seq. (the "DLLC Act")) (the "Sole Member") of RMS REO CS, LLC, RMS REO BRC, LLC, RMS REO BRC II, LLC and RMS 2018-09, LLC (each a "Single Member LLC" and, collectively, the "Single Member LLCs");

**WHEREAS**, the Board of Directors of the Parent and the Governing Body of the Company previously approved the form, terms and provisions of, and the execution, delivery, and performance of, and, on February 8, 2019, the Company entered into, the restructuring support agreement (the "RSA") with an ad hoc group of lenders (the "Term Loan Lenders") holding more than 75% of the aggregate total principal amount of the Parent's senior secured first lien term loan, borrowed pursuant to the Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, supplemented or otherwise modified, the "Credit Agreement") establishing the Term Loan Lenders' support for a prearranged chapter 11 plan of reorganization;

**WHEREAS**, the Board of Directors of the Parent and, if applicable, the Governing Body of the Company, previously approved, and on February 8, 2019, the Parent and the applicable Companies entered into, the Commitment Letter (the "Commitment Letter"), by and among the Parent as Guarantor, its wholly-owned direct subsidiaries Reverse Mortgage Solutions, Inc. ("RMS") and Ditech Financial LLC ("Ditech") as Sellers, Barclays Bank PLC ("Barclays") as Administrative Agent

EXHIBIT A

and as Buyer and Nomura Corporate Funding Americas, LLC ("Nomura") as Buyer (together with Barclays in its capacity as Buyer, the "Buyers"), pursuant to which the Buyers committed to provide new debtor-in-possession financing in an amount of up to $1.9 billion on terms and subject to conditions set forth in the Commitment Letter and the term sheet attached thereto;

   **WHEREAS**, the Governing Body of the Company has reviewed and had the opportunity to ask questions about the materials attached hereto and the impact of the foregoing on the Company's business; and

   **WHEREAS**, the Governing Body has considered and determined that taking the applicable actions set forth below are in the best interests of the Company and, therefore, desires to approve the following resolutions.

## Commencement of Chapter 11 Cases

   **RESOLVED**, that it is desirable and in the best interests of the Company, its creditors, and other parties in interest and the Governing Body approves and authorizes the filing of petitions by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and be it further

   **RESOLVED**, that it is desirable and in the best interests of the Company, its creditors, and other parties in interest that the Company and its advisors prepare, finalize and file, as appropriate, the prearranged chapter 11 plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") consistent with the terms of the RSA;

   **RESOLVED**, that any officer of the Company (each, an "Authorized Officer"), in each case, acting singly or jointly, be, and each hereby is, authorized, empowered, and directed to execute and file in the name and on behalf of the Company all petitions, schedules, motions, lists, applications, pleadings, and other papers in the Bankruptcy Court, and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, investment bankers and other professionals, and to take and perform any and all further acts and deeds which such Authorized Officer deems necessary, proper, or desirable in connection with the chapter 11 cases (the "Chapter 11 Cases"), the Plan and the Disclosure Statement, including, without limitation, negotiating, executing, delivering and performing any and all documents, agreements, certificates and/or instruments in connection with the transactions and professional retentions set forth in this resolution, with a view to the successful prosecution of the Chapter 11 Cases; and be it further

## Retention of Advisors

   **RESOLVED**, that in connection with the Chapter 11 Cases, any Authorized Officer, in each case, acting singly or jointly, be, and each hereby is, authorized, empowered, and directed, with full power of delegation, in the name and on behalf of the Company, to employ and retain all assistance by legal counsel, accountants, financial advisors, investment bankers and other professionals, on behalf of the Company, which such Authorized Officer deems necessary, appropriate or advisable in connection with, or in furtherance of, the Chapter 11 Cases, with a view to the successful prosecution of the Chapter

EXHIBIT A

11 Cases (such acts to be conclusive evidence that such Authorized Officer deemed the same to meet such standard); and be it further

  **RESOLVED**, that the firm of Houlihan Lokey Capital, Inc., located at 10250 Constellation Blvd., 5th Floor, Los Angeles, California 90067, is hereby retained as investment banker for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

  **RESOLVED**, that the law firm of Weil, Gotshal & Manges LLP, located at 767 Fifth Avenue, New York, NY 10153, is hereby retained as counsel for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

  **RESOLVED**, that the firm of AlixPartners, located at 909 Third Avenue, New York, New York 10022, is hereby retained as financial advisor for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval, and that the Company's prior engagement of AlixPartners is hereby ratified in all respects; and be it further

  **RESOLVED**, that the firm of Epiq Corporate Restructuring, LLC, located at 777 Third Avenue, 12th Floor, New York, New York 10017, is hereby retained as claims, noticing, and solicitation agent and administrative advisor for the Company in the Chapter 11 Cases, subject to Bankruptcy Court approval; and be it further

## Specified Consent with Respect to Sole Member

  **RESOLVED**, that the written consent of the Sole Member provided herein to file a petition seeking relief under the Bankruptcy Code shall, to the maximum extent permitted by law, constitute a "written consent" for purposes of §18-304 of the DLLC Act; and be it further

  **RESOLVED**, that it is desirable and in the best interests of the Sole Member, its creditors, and other parties in interest that the Sole Member shall not cease to be a "member" (as such term is used in the DLLC Act) of any Single Member LLC as a result of the Chapter 11 Cases or upon the happening of any other event specified in §18-304 of the DLLC Act; and be it further

## General

  **RESOLVED,** that any Authorized Officer is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to cause the Company to enter into, execute, deliver, certify, file and/or record, perform, and approve any necessary public disclosures and filings related to, and such other documents, agreements, instruments and certificates as may be required by the Chapter 11 Cases or retention of advisors and to take such other actions that in the judgment of the Authorized Officer shall be or become necessary, proper or desirable in connection therewith; and be it further

  **RESOLVED**, that any actions taken by any Authorized Officer, for or on behalf of the Company, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Company.

*[Signature Pages Follow]*

3

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the managing member of the entities listed under "Group 1" on <u>Schedule I</u> has executed this written consent as of the date first set forth above.

**DITECH HOLDING CORPORATION**

 /s/ Kimberly Perez_____
Name: Kimberly Perez
Title:  SVP & Chief Accounting Officer

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being all of the members of the board of directors of the entity listed under "Group 2" on Schedule I have executed this unanimous written consent as of the date first set forth above.

/s/ Jeffrey Baker
Jeffrey Baker

/s/ Alan Clark
Alan Clark

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the sole member of the board of directors of the entity listed under "Group 3" on <u>Schedule I</u> has executed this unanimous written consent as of the date first set forth above.

<u>/s/ Laura Reichel</u>
Laura Reichel

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the sole member or managing member, as applicable, of the entities listed under "Group 4" on <u>Schedule I</u>, has executed this written consent as of the date first set forth above.

**GREEN TREE CREDIT SOLUTIONS LLC,**

<u>  /s/ Kimberly Perez                    </u>
Name: Kimberly Perez
Title:  SVP & Chief Accounting Officer

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the managing member of each entity listed under "Group 5" on <u>Schedule I</u>, has executed this written consent as of the date first set forth above.

**REVERSE MORTGAGE SOLUTIONS, INC.**

<u>/s/ Jeanetta Brown</u>
Name: Jeanetta Brown
Title:  Vice President

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the managing member of the entity listed under "Group 6" on <u>Schedule I</u>, has executed this written consent as of the date first set forth above.

**WALTER MANAGEMENT HOLDING COMPANY LLC**

_/s/ Kimberly Perez_____
Name: Kimberly Perez
Title:  SVP & Chief Accounting Officer

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the managing member of the entity listed under "Group 7" on <u>Schedule I</u>, has executed this written consent as of the date first set forth above.

**GREEN TREE SERVICING CORP.**

<u>  /s/ Kimberly Perez                        </u>
Name: Kimberly Perez
Title:  SVP & Chief Accounting Officer

EXHIBIT A

ELECTRONICALLY FILED
2019 Apr 01 1:46 PM
CLERK OF COURT

## Schedule I

### *Group 1*

Walter Reverse Acquisition LLC, a Delaware limited liability company

Green Tree Credit Solutions LLC, a Delaware limited liability company

Marix Servicing LLC, a Delaware limited liability company

### *Group 2*

Reverse Mortgage Solutions, Inc., a Delaware corporation

### *Group 3*

Green Tree Insurance Agency of Nevada, Inc., a Nevada corporation

Green Tree Servicing Corp., a Delaware corporation

### *Group 4*

Walter Management Holding Company LLC, a Delaware limited liability company

DF Insurance Agency LLC, a Delaware limited liability company

Green Tree Investment Holdings III LLC, a Delaware limited liability company

### *Group 5*

Mortgage Asset Systems, LLC, a Delaware limited liability company

REO Management Solutions, LLC, a Delaware limited liability company

### *Group 6*

Green Tree Credit LLC, a New York limited liability company

### *Group 7*

Ditech Financial LLC, a Delaware limited liability company

EXHIBIT A

ACTION BY
WRITTEN CONSENT OF
THE GOVERNING BODIES OF

DITECH FINANCIAL LLC
REVERSE MORTGAGE SOLUTIONS, INC.
RMS REO CS, LLC
RMS REO BRC, LLC
RMS REO BRC II, LLC

February 10, 2019

The required members of the board of directors, the sole member, the managing member, the sole manager or the sole general partner, as the case may be (as applicable, the "Governing Body"), of each of the entities referenced above (each, a "Company" and collectively, the "Companies"), do hereby consent to, adopt, and approve, by written consent in accordance with applicable law, the following resolutions and every action effected thereby:

WHEREAS, the Company is a direct or indirect wholly-owned subsidiary of Ditech Holding Corporation (the "Parent");

WHEREAS, the Board of Directors of the Parent and the Governing Body of each of Reverse Mortgage Solutions, Inc. ("RMS") and Ditech Financial LLC ("Ditech") previously approved the form, terms and provisions of, and the execution, delivery, and performance of, and, on February 8, 2019, the Parent and certain of its subsidiaries, including RMS and Ditech, entered into, the restructuring support agreement (the "RSA") with an ad hoc group of lenders (the "Term Loan Lenders") holding more than 75% of the aggregate total principal amount of the Parent's senior secured first lien term loan, borrowed pursuant to the Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, supplemented or otherwise modified, the "Credit Agreement") establishing the Term Loan Lenders' support for a prearranged chapter 11 plan of reorganization;

WHEREAS, the Board of Directors of the Parent and the Governing Body of each of RMS and Ditech previously approved, and on February 8, 2019, the Parent, RMS and Ditech entered into, the Commitment Letter (the "Commitment Letter"), by and among the Parent as Guarantor, its wholly-owned direct subsidiaries Reverse Mortgage Solutions, Inc. ("RMS") and Ditech Financial LLC ("Ditech") as Sellers, Barclays Bank PLC ("Barclays") as Administrative Agent and as Buyer and Nomura Corporate Funding Americas, LLC ("Nomura") as Buyer (together with Barclays in its capacity as Buyer, the "Buyers"), pursuant to which the Buyers committed to provide new debtor-in-possession financing in an amount of up to $1.9 billion on terms and subject to conditions set forth in the Commitment Letter and the term sheet attached thereto;

WHEREAS, the Governing Body of the Company has reviewed and had the opportunity to ask questions about the materials attached hereto and the impact of the foregoing on the Company's business; and

EXHIBIT A

**WHEREAS**, the Governing Body has considered and determined that taking the applicable actions set forth below are in the best interests of the Company and, therefore, desires to approve the following resolutions.

**Debtor-in-Possession Financing**

**RESOLVED**, that as previously authorized and agreed to by Ditech and RMS in connection with the Commitment Letter, it is in the best interest of Ditech, RMS, RMS REO CS, LLC ("RMS REO CS"), RMS REO BRC, LLC ("RMS REO BRC") and RMS REO BRC II, LLC ("RMS REO BRC II") to engage in, and the Parent, Ditech, RMS, RMS REO CS, RMS REO BRC and RMS REO BRC II will obtain benefits from, the financing transactions contemplated by the agreements listed on <u>Schedule A</u> hereto and any and all of the other agreements, including, without limitation, any other guarantees, certificates, documents and instruments authorized, executed, delivered, reaffirmed, verified and/or filed in connection with the Debtor-in-Possession Financing (as defined below) (together with the transaction documents listed on <u>Schedule A</u>, collectively, the "DIP Financing Documents"), which, subject to the approval of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in connection with the chapter 11 cases of the Parent, RMS, Ditech and certain other subsidiaries of the Parent, will provide the Parent, Ditech, RMS and RMS REO BRC II up to $1.9 billion in available warehouse financing, which is necessary and appropriate for the conduct, promotion and attainment of the business of the Parent and its subsidiaries, including Ditech, RMS and RMS REO BRC II (the "Debtor-in-Possession Financing") (capitalized terms used in this section with respect to Debtor-in-Possession Financing and not otherwise defined herein shall have the meanings ascribed to such terms in the Commitment Letter or the term sheet attached thereto); and be it further

**RESOLVED**, that the Company's performance of its obligations under the DIP Financing Documents, including the borrowings and guarantees contemplated thereunder, are hereby, in all respects confirmed, ratified and approved; and be it further

**RESOLVED**, that any Authorized Officer is hereby authorized, empowered and directed, in the name and on behalf of the Company, to cause the Company to negotiate and approve the terms, provisions of and performance of, and to prepare, execute and deliver the DIP Financing Documents, on substantially the same terms and conditions presented to the Company, in the name and on behalf of the Company under its corporate seal or otherwise, and such other documents, agreements, instruments and certificates as may be required by the Administrative Agent or required by the DIP Financing Documents; and be it further

**RESOLVED**, that any Authorized Officer is hereby authorized, as part of the adequate protection to be provided to the lenders and administrative agent under the Credit Agreement, to grant replacement security interests in, and replacement liens on, any and all property of the Company as collateral pursuant to the Bankruptcy Court's orders to secure all of the obligations and liabilities of the Company thereunder, and to authorize, execute, verify, file and/or deliver to the administrative agent, on behalf of the Company, all agreements, documents and instruments required by the lenders or the administrative agent under the Credit Agreement in connection with the foregoing; and be it further

**RESOLVED**, that any Authorized Officer is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to take all such further actions including, without limitation, to pay all fees and expenses, in accordance with the terms of the DIP Financing Documents,

EXHIBIT A

which shall, in such Authorized Officer's judgment, be necessary, proper or advisable to perform the Company's obligations under or in connection with the DIP Financing Documents and the transactions contemplated therein and to carry out fully the intent of the foregoing resolutions; and be it further

   **RESOLVED**, that any Authorized Officer is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the DIP Financing Documents which shall, in such Authorized Officer's sole judgment, be necessary, proper or advisable; and be it further

**General**

   **RESOLVED,** that any Authorized Officer is hereby authorized, empowered and directed, in the name and on behalf of the Company, to cause the Company to enter into, execute, deliver, certify, file and/or record, perform and approve any necessary public disclosures and filings related to, such documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities and certificates as may be required in connection with the DIP Financing Documents and Debtor-in-Possession Financing, and to take such other actions that in the judgment of the Authorized Officer shall be or become necessary, proper or desirable in connection therewith; and be it further

   **RESOLVED**, that any actions taken by any Authorized Officer, for or on behalf of the Company, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Company.

*[Signature Pages Follow]*

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being all of the members of the board of directors of **Reverse Mortgage Solutions, Inc.**, a Delaware corporation, have executed this unanimous written consent as of the date first set forth above.

/s/ Jeffrey Baker
Jeffrey Baker

/s/ Alan Clark
Alan Clark

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the sole member of each entity listed below, has executed this written consent as of the date first set forth above.

**RMS REO CS, LLC**

**RMS REO BRC, LLC**

**RMS REO BRC II, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**
as Member

/s/ Jeanetta Brown_____
Name: Jeanetta Brown
Title:  Vice President

EXHIBIT A

**IN WITNESS WHEREOF**, the undersigned, being the managing member of **Ditech Financial LLC**, a Delaware limited liability company, has executed this written consent as of the date first set forth above.

**GREEN TREE SERVICING CORP.**

 /s/ Kimberly Perez
Name: Kimberly Perez
Title:  SVP & Chief Accounting Officer

EXHIBIT A

## Schedule A

1. Master Refinancing Agreement, dated as of the Closing Date, by and among Barclays, as administrative agent for the Buyers (as defined therein) and other Secured Parties (as defined therein), Barclays and Nomura, each as a Buyer (as defined therein), Barclays Capital Inc. and Nomura Securities International, Inc., each as an MSFTA Counterparty (as defined therein), Ditech and Reverse Mortgage Solutions, Inc., each as a Seller (as defined therein) and RMS REO BRC II, LLC, as REO Subsidiary (as defined therein) (the "Omnibus Agreement").

2. Master DIP Fee Letter, dated as of the Closing Date, among Barclays, as administrative agent, Barclays and Nomura, as Committed Buyers (as defined therein), Ditech, RMS and Ditech Holding Corporation.

3. Master DIP Guaranty, dated as of the Closing Date, made by Guarantor in favor of Barclays, as Administrative Agent, for the benefit of Buyers and the other Buyer Parties (as defined therein).

4. Margin, Setoff and Netting Agreement, dated as of the Closing Date, among Barclays, as Administrative Agent, Barclays Capital, Inc., Nomura Securities International, Inc., Nomura, Ditech, RMS, and RMS REO BRC II, LLC and acknowledged and agreed to by Ditech Holding Corporation.

5. Master Administration Agreement, dated as of the Closing Date, among Barclays, as Administrative Agent for the Buyers and other Secured Parties (as defined therein), Barclays and Nomura, each as a Buyer (as defined therein), Barclays Capital Inc. and Nomura Securities International, Inc., each as a MSFTA Counterparty (as defined therein), Ditech and RMS, each as a Seller (as defined therein), and RMS REO BRC II, LLC as REO Subsidiary (as defined therein).

6. Amended and Restated Master Repurchase Agreement, dated as of the Closing Date, by and among Barclays and Nomura, as Purchasers (as defined therein), Barclays, as Agent (as defined therein), RMS and RMS REO BRC II, LLC.

7. Amended and Restated Pricing Side Letter, dated as of the Closing Date, among Barclays, as Purchaser and Agent, Nomura, as Purchaser, RMS and RMS REO BRC II, LLC.

8. Assignment Agreement, dated as of the Closing Date, between RMS REO CS, LLC and RMS.

9. Assignment Agreement, dated as of the Closing Date, between RMS REO BRC, LLC and RMS.

10. Assignment Agreement, dated as of the Closing Date, between RMS REO BRC II, LLC and RMS.

11. Amended and Restated Custodial Agreement, dated as of the Closing Date, by and among RMS REO BRC II, LLC (the "REO Subsidiary"), RMS, Deutsche Bank National Trust Company, as custodian for Purchasers (as defined therein) and for the REO Subsidiary, Barclays and Nomura, as Purchasers (as defined therein), and Barclays, as Agent (as defined therein).

12. Amended and Restated Deposit Account Control Agreement, dated as of the Closing Date, by and among RMS, Barclays, as Agent (as defined therein), and Wells Fargo Bank, National Association.

EXHIBIT A

13. Amendment No. 1 to the Limited Liability Company Agreement of RMS REO BRC II, LLC, dated as of the Closing Date, entered into by RMS, as the sole member, RMS REO BRC II, LLC, and consented to by Barclays, as Agent.

14. Indenture, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Indenture"), by and among Ditech Agency Advance Trust, as issuer (the "Agency Facility Issuer"), Wells Fargo Bank, N.A. ("Wells Fargo"), as indenture trustee (in such capacity, the "Agency Facility Indenture Trustee"), calculation agent, paying agent and securities intermediary, Ditech, as administrator (in such capacity, the "Agency Facility Administrator") and as servicer (in such capacity, the "Agency Facility Servicer") and Barclays, as administrative agent (in such capacity, the "Agency Facility Administrative Agent") (successor to Credit Suisse First Boston Mortgage Capital LLC, as initial administrative agent).

15. Series 2019-VF1 Indenture Supplement to Agency Facility Indenture, dated as of the Closing Date, by and among the Agency Facility Issuer, the Agency Facility Indenture Trustee (as indenture trustee, calculation agent, paying agent and securities intermediary), the Agency Facility Administrator, the Agency Facility Servicer and the Agency Facility Administrative Agent.

16. Receivables Sale Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Receivables Sale Agreement"), by and among the Agency Facility Servicer, as servicer and as the receivables seller (in such capacity, the "Agency Facility Receivables Seller"), Ditech Agency Advance Depositor LLC, as depositor (the "Agency Facility Depositor") and the Company, as guarantor.

17. Amendment No.1 to the Agency Facility Receivables Sale Agreement, dated as of the Closing Date, by and among the Agency Facility Servicer, the Agency Facility Receivables Seller, the Agency Facility Depositor and the Company, as guarantor.

18. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Depositor and the Agency Facility Receivables Seller.

19. Receivables Pooling Agreement, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Depositor and the Agency Facility Issuer.

20. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Depositor and the Agency Facility Issuer.

21. Administration Agreement, dated as of February 9, 2018 and effective as of February 12, 2018, by and between the Agency Facility Issuer and the Agency Facility Administrator.

22. Acknowledgment Agreement with Respect to Servicing Advance Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Acknowledgment Agreement"), by and among the Agency Facility Issuer, the Agency Facility Depositor, the Agency Facility Servicer, the Agency Facility Indenture Trustee, Fannie Mae and the Agency Facility Administrative Agent.

EXHIBIT A

23. Amendment No. 1 to the Agency Facility Acknowledgment Agreement, dated as of April 20, 2018, by and among the Agency Facility Issuer, the Agency Facility Depositor, the Agency Facility Servicer, the Agency Facility Indenture Trustee, Fannie Mae and the Agency Facility Administrative Agent.

24. Amendment No. 2 to the Agency Facility Acknowledgment Agreement, dated as of the Closing Date, by and among the Agency Facility Issuer, the Agency Facility Depositor, the Agency Facility Servicer, the Agency Facility Indenture Trustee, Fannie Mae and the Agency Facility Administrative Agent.

25. Series 2019-VF1 Variable Funding Note Purchase Agreement, dated as of the Closing Date, (the "Agency Facility Note Purchase Agreement"), by and among Ditech, as the Agency Facility Servicer, the Agency Facility Administrator and the Agency Facility Receivables Seller, the Agency Facility Depositor, the Agency Facility Issuer, the Administrative Agent, and Barclays, as a Purchaser Agent ("Agency Facility Purchaser").

26. Ditech Agency Advance Trust Advance Receivables Backed Note, Series 2019-VF1 Note, Number 1 (the "Agency Facility Note"), dated as of the Closing Date, in the name of the Agency Facility Purchaser.

27. Amended and Restated Trust Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Agency Facility Trust Agreement"), by and among the Agency Facility Depositor, Wilmington Trust, National Association, as the owner trustee (in such capacity, the "Agency Facility Owner Trustee"), and the Agency Facility Administrator.

28. Amendment No.1 to the Agency Facility Trust Agreement, dated as of the Closing Date, by and among the Agency Facility Depositor, Wilmington Trust, National Association, the Agency Facility Owner Trustee and the Agency Facility Administrator.

29. Amended and Restated Limited Liability Company Agreement of the Agency Facility Depositor (the "Agency Facility Depositor LLC Agreement"), dated as of February 9, 2018 and effective as of February 12, 2018, by and among Ditech, as the sole economic member of the Agency Facility Depositor and Albert Fioravanti, as the Special Member and Independent Manager of the Agency Facility Depositor.

30. Amendment No. 1 to the Agency Facility Depositor LLC Agreement, dated as of the Closing Date, made by Ditech, as the sole economic member of the Agency Facility Depositor and consented to by Albert Fioravanti, as the Special Member and Independent Manager of the Agency Facility Depositor and Barclays, as sole noteholder.

31. Indenture, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Indenture"), by and among Ditech PLS Advance Trust II, as issuer (the "PLS Facility Issuer"), Wells Fargo Bank, as indenture trustee (in such capacity, the "PLS Facility Indenture Trustee"), calculation agent, paying agent and securities intermediary, Ditech, as administrator (in such capacity, the "PLS Facility Administrator") and as servicer (in such capacity, the "PLS Facility Servicer") and Barclays, as administrative agent (in such capacity, the "PLS Facility Administrative Agent") (successor to Credit Suisse First Boston Mortgage Capital LLC, as initial administrative agent).

EXHIBIT A

32. Series 2019-VF1 Indenture Supplement to PLS Facility Indenture, dated as of the Closing Date (the "PLS Facility Indenture Supplement"), by and among the PLS Facility Issuer, the PLS Facility Indenture Trustee (as indenture trustee, calculation agent, paying agent and securities intermediary), the PLS Facility Administrator, the PLS Facility Servicer and the PLS Facility Administrative Agent.

33. Receivables Sale Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Receivables Sale Agreement"), by and among the PLS Facility Servicer, as servicer and as the receivables seller (in such capacity, the "PLS Facility Receivables Seller"), Ditech PLS Advance Depositor LLC, as depositor (the "PLS Facility Depositor") and the Company, as guarantor.

34. Amendment No.1 to the PLS Facility Receivables Sale Agreement, dated as of the Closing Date, by and among the PLS Facility Servicer, the PLS Facility Receivables Seller, the PLS Facility Depositor and the Company, as guarantor ("PLS Facility Receivables Sale Agreement Amendment").

35. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (the "PLS Facility Assignment of Receivables"), by and between the PLS Facility Depositor and the PLS Facility Receivables Seller.

36. Receivables Pooling Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (the "PLS Facility Receivables Pooling Agreement"), by and between the PLS Facility Depositor and PLS Facility Issuer.

37. Assignment of Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (the "Depositor PLS Facility Assignment of Receivables"), by and between the PLS Facility Depositor and the PLS Facility Issuer.

38. Administration Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (the "PLS Facility Administration Agreement"), by and between the PLS Facility Issuer and the PLS Facility Administrator.

39. Acknowledgment Agreement with Respect to Servicing Advance Receivables, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Acknowledgment Agreement"), by and among the PLS Facility Issuer, the PLS Facility Depositor, the PLS Facility Servicer, the PLS Facility Indenture Trustee, Fannie Mae and the PLS Facility Administrative Agent.

40. Series 2019-VF1 Variable Funding Note Purchase Agreement, dated as of the Closing Date, and effective as of the Effective Date (the "PLS Facility Note Purchase Agreement"), by and among Ditech, as the PLS Facility Servicer, the PLS Facility Administrator and the PLS Facility Receivables Seller, the PLS Facility Depositor, the PLS Facility Issuer, the Administrative Agent, and Barclays, as a Purchaser Agent ("PLS Facility Purchaser").

41. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class A-VF1 Note Number 1 (the "PLS Facility Note, Class A"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

EXHIBIT A

42. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class B-VF1 Note Number 1 (the "PLS Facility Note, Class B"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

43. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class C-VF1 Note Number 1 (the "PLS Facility Note, Class C"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

44. Ditech PLS Advance Trust II Advance Receivables Backed Note, Series 2019 Class D-VF1 Note Number 1 (the "PLS Facility Note, Class D"), dated as of the Closing Date, in the name of the PLS Facility Purchaser.

45. Amended and Restated Trust Agreement, dated as of February 9, 2018 and effective as of February 12, 2018 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "PLS Facility Trust Agreement"), by and among the PLS Facility Depositor, Wilmington Trust, National Association, as the owner trustee (in such capacity, the "PLS Facility Owner Trustee"), and the PLS Facility Administrator.

46. Amendment No.1 to the PLS Facility Trust Agreement, dated as of the Closing Date, by and among the Agency Facility Depositor, the Agency Facility Owner Trustee and the Agency Facility Administrator.

47. Amended and Restated Limited Liability Company Agreement of the PLS Facility Depositor (the "PLS Facility Depositor LLC Agreement"), dated as of February 9, 2018 and effective as of February 12, 2018, by and among Ditech, as the sole economic member of the PLS Facility Depositor and Albert Fioravanti, as the Special Member and Independent Manager of the PLS Facility Depositor.

48. Amendment No. 1 to the PLS Facility Depositor LLC Agreement, dated as of the Closing Date, made by Ditech, as the sole economic member of the PLS Facility Depositor and consented to by Albert Fioravanti, as the Special Member and Independent Manager of the PLS Facility Depositor and Barclays, as sole noteholder.

49. Pledge Agreement, dated as of the Closing Date, made by the Ditech in favor of Barclays.

50. Master Repurchase Agreement, dated as of the Closing Date, by and among Barclays, as Administrative Agent on behalf of Buyers (as defined therein), Barclays and Nomura, as Buyers (as defined therein), other Buyers party thereto from time to time, and Ditech.

51. Pricing Side Letter, dated the Closing Date, among Barclays, as Administrative Agent for the benefit of Buyers (as defined therein), Barclays and Nomura, as Committed Buyers (as defined therein), and Ditech.

52. Power of Attorney, dated as of the Closing Date, to be entered into by Ditech.

53. Custodial and Disbursement Agreement, dated as of the Closing Date, by and among Barclays and Nomura, as Buyers (as defined therein), Ditech, Barclays, as agent of the Buyers, and Wells Fargo Bank, N.A.

EXHIBIT A

54. Amended and Restated Deposit Account Control Agreement, dated as of the Closing Date, by and among Barclays, as Administrative Agent (as defined therein), Ditech and U.S. Bank National Association.

55. Second Amendment to the Master Securities Forward Transaction Agreement, dated as of the Closing Date, between Barclays Capital Inc. and Ditech.

56. Second Amendment to the Master Securities Forward Transaction Agreement, dated as of the Closing Date, between Nomura Securities International, Inc. and Ditech.

EXHIBIT A

<table>
<tr><td colspan="2">Fill in this information to identify the case:</td></tr>
<tr><td colspan="2">Debtor name:  Ditech Financial LLC</td></tr>
<tr><td colspan="2">United States Bankruptcy Court  for the:  Southern  District of  New York<br>(State)</td></tr>
<tr><td colspan="2">Case number (If known):</td></tr>
</table>

☐   Check if this is an amended filing

## Official Form 204

# Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 40 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 40 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case.  Include claims which the debtor disputes.  Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 40 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | ISGN Solutions Inc.<br>Attn.:  E. Rock Primas<br>2330 Commerce Park Drive, NE, Suite 2<br>Palm Bay, Florida  32905 | Attn.:  E. Rock Primas<br>Phone:  (609) 932-4712<br>Email:  rock.primas@isgnsolutions.com | Trade Debt | | | | $1,531,484.00 |
| 2 | Black Knight Tech Solutions<br>Attn.:  Darlene Ledet<br>601 Riverside Avenue<br>Jacksonville, FL  32204 | Attn.:  Darlene Ledet<br>Phone:  (904) 854-3153<br>Email:  darlene.ledet@bkfs.com | Trade Debt | | | | $1,458,204.00 |
| 3 | Servicelink<br>Attn.:  Joe Greve<br>9600 Reserve Run<br>Brecksville, Ohio  15108 | Attn.:  Joe Greve<br>Phone:  (216) 374-1888<br>Email:  joe.greve@svclnk.com | Trade Debt | | | | $1,222,945.00 |
| 4 | Corelogic Tax Services LLC<br>Attn.:  Tom Blauvelt<br>4 First American Way<br>Santa Ana, California  92707 | Attn.:  Tom Blauvelt<br>Phone:  (512) 977-3716<br>Email:  tblauvelt@corelogic.com | Trade Debt | | | | $1,155,282.00 |
| 5 | Safeguard Properties Mgmt. LLC<br>Attn.:  Gregory Sharp<br>7887 Safeguard Cir.<br>Valley View, Ohio  44125 | Attn.:  Gregory Sharp<br>Phone:  (216) 739-2900<br>Email:  gregory.sharp@safeguardproperties.com | Trade Debt | | | | $1,150,138.00 |
| 6 | Tata Consultancy Services Ltd.<br>Attn.:  Prashant Panghal<br>379 Thornall Street<br>Edison, New Jersey  08837 | Attn.:  Prashant Panghal<br>Phone:  (732) 986-6921<br>Email:  prashant1.p@tcs.com | Trade Debt | | | | $1,135,384.00 |
| 7 | Cognizant Technology Solutions<br>Attn.:  Janine Lj Durham<br>2512 Dunlap Avenue<br>Phoenix, Arizona  32905 | Attn.:  Janine Lj Durham<br>Phone:  (602) 315-0481<br>Email:  janine.durham@cognizant.com | Trade Debt | | | | $1,023,481.00 |

EXHIBIT A

ELECTRONICALLY FILED
2019 Apr 01 1:46 PM
CLERK OF COURT

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8   Corelogic Information Solutions<br>Attn.: Tom Blauvelt<br>4 First American Way<br>Santa Ana, California 92707 | Attn.: Tom Blauvelt<br>Phone: (512) 977-3716<br>Email: tblauvelt@corelogic.com | Trade Debt | | | | $800,585.00 |
| 9   Black Knight Financial Services<br>Attn.: Darlene Ledet<br>601 Riverside Avenue<br>Jacksonville, Florida 32204 | Attn.: Darlene Ledet<br>Phone: (904) 854-3153<br>Email: darlene.ledet@bkfs.com | Trade Debt | | | | $586,915.00 |
| 10   Verizon Business<br>Attn.: Lona Gruebele<br>22001 Loudoun County Pkwy<br>Ashburn, Virgina 20147 | Attn.: Lona Gruebele<br>Phone: (612) 805-1034<br>Email: lona.j.gruebele@verizon.com | Trade Debt | | | | $555,663.00 |
| 11   Nationwide Title Clearing Inc.<br>Attn.: Debbie Lastoria<br>2100 Alt 19 North<br>Palm Harbor, Florida 34683 | Attn.: Debbie Lastoria<br>Phone: (727) 771-4000<br>Email: debbie_lastoria@nwtc.com | Trade Debt | | | | $554,418.00 |
| 12   NCP Solutions LLC<br>Attn.: Tom Hart<br>5200 East Lake Boulevard<br>Birmingham, Alabama 35217 | Attn.: Tom Hart<br>Phone: (205) 421-7254<br>Email: thart@ncpsolutions.com | Trade Debt | | | | $492,500.00 |
| 13   Pegasystems Inc.<br>Attn.: Kirk Faustman<br>One Rogers Street<br>Cambridge, Massachusetts 02142 | Attn.: Kirk Faustman<br>Phone: (617) 777-3229<br>Email: kirk.faustman@pega.com | Trade Debt | | | | $480,180.00 |
| 14   Padgett Law Group<br>Attn.: Timothy D. Padgett<br>6267 Old Water Oak Road, Suite 203<br>Tallahassee, Florida 32312 | Attn.: Timothy D. Padgett<br>Phone: (850) 422-2520<br>Email: accounting@padgettlaw.net | Professional Services | | | | $471,337.00 |
| 15   McCalla Raymer Leibert Pierce LLC<br>Attn.: Michael Allgood<br>1544 Old Alabama Road<br>Roswell, Georgia 30076 | Attn.: Michael Allgood<br>Phone: (770) 643-7202<br>Email: michael.allgood@mccalla.com | Trade Debt | | | | $462,992.00 |
| 16   RAS Crane LLC<br>Attn.: John Crane<br>10700 Abbott's Bridge Road; Suite 170<br>Duluth, Georgia 30097 | Attn.: John Crane<br>Phone: (972) 757-1486<br>Email: jcrane@rascrane.com | Professional Services | | | | $446,268.00 |
| 17   Locke Lord LLP<br>Attn.: Lori Barton<br>2200 Ross Avenue, Suite 2800<br>Dallas, Texas 75201 | Attn.: Lori Barton<br>Phone: (214) 740-8000<br>Email: lori.barton@lockelord.com | Professional Services | | | | $443,666.00 |
| 18   Ellie Mae Inc.<br>Attn.: John Coppa<br>4420 Rosewood Drive, Suite 500<br>Pleasanton, CA 94588 | Attn.: John Coppa<br>Phone: (925) 227-2060<br>Email: john.coppa@elliemae.com | Trade Debt | | | | $347,728.00 |
| 19   Quattro Direct LLC<br>Attn.: Dan Lawler<br>200 Berwyn Park, Suite 310<br>Berwyn, Pennsylvania 19312 | Attn.: Dan Lawler<br>Phone: (610) 993-0070<br>Email: dlawler@quattrodirect.com | Trade Debt | | | | $342,006.00 |
| 20   KML Law Group PC<br>Attn.: Lisa Lee<br>701 Market Street, Suite 5000<br>Philadelphia, Pennsylvania 19106 | Attn.: Lisa Lee<br>Phone: (215) 627-1322<br>Email: llee@kmllawgroup.com | Professional Services | | | | $332,535.00 |
| 21   Phelan Hallinan LLP<br>Attn.: Jay Jones<br>1617 JFK Blvd., Suite 1400<br>Philadelphia, Pennsylvania 19103-1814 | Attn.: Jay Jones<br>Phone: (215) 563-7000<br>Email: jay.jones@phelanhallinan.com | Professional Services | | | | $305,245.00 |

EXHIBIT A

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 22 | Insight Direct/ Datalink Attn.: Michael Schmidt 6820 South Harl Avenue Tempe, Arizona 85283 | Attn.: Michael Schmidt Phone: (651) 260-4017 Email: Michael.schmidt@insight.com | Trade Debt | | | | $300,279.00 |
| 23 | TCS America Attn.: Prashant Panghal 379 Thornall Street Edison, New Jersey 08837 | Attn.: Prashant Panghal Phone: (732) 986-6921 Email: prashant1.p@tcs.com | Trade Debt | | | | $297,383.00 |
| 24 | Robertson Anschutz & Schneid PL Attn.: Eric L. Bronfeld 6409 Congress Avenue, Suite 100 Boca Raton, Florida 33487 | Attn.: Eric L. Bronfeld Phone: (561) 241-6901 Email: arcollections@rasflaw.com | Professional Services | | | | $290,502.00 |
| 25 | American Bankers Insurance Attn.: Michelle Griffith 11222 Quail Roost Drive Miami, Florida 33157 | Attn.: Michelle Griffith Phone: (305) 253-2244 Email: michelle.griffith@assurant.com | Trade Debt | | | | $285,213.00 |
| 26 | Indecomm Holdings Inc. Attn.: Teddi Horan 205 Regency Executive Park Drive, Suite 500 Charlotte, North Carolina 28217 | Attn.: Teddi Horan Phone: (215) 962-7212 Email: teddi.horan@indecomm.net | Trade Debt | | | | $284,830.00 |
| 27 | Wells Fargo Bank N.A Attn.: Holly Monday 420 Montgomery Street San Francisco, California 94104 | Attn.: Holly Monday Phone: (703) 865-7740 Email: holly.monday@wellsfargo.com | Trade Debt | | | | $271,624.00 |
| 28 | Newcourse Communications Inc. Attn.: Valerie Griffin 5010 Linbar Dr., Ste. 100 Nashville, Tennessee 37211 | Attn.: Valerie Griffin Phone: (615) 921-6656 Email: valerie.griffin@newcoursecc.com | Trade Debt | | | | $270,000.00 |
| 29 | Xome Valuation Services Attn.: Allen Illgen 444 East Washington Street Indianapolis, Indiana 46204 | Attn.: Allen Illgen Phone: (612) 207-4012 Email: allen.illgen@assurant.com | Trade Debt | | | | $249,474.00 |
| 30 | Rean Cloud LLC Attn.: Rupa Vasireddy 2201 Cooperative Way #250 Herndon, Virginia 20171 | Attn.: Rupa Vasireddy Phone: (844) 377-7326 Email: rupa@reancloud.com | Trade Debt | | | | $240,667.00 |
| 31 | US Real Estate Services Inc. Attn.: Becca Nottberg 25520 Commerce Centre Drive; 1st Floor Lake Forest, California 92630 | Attn.: Becca Nottberg Phone: (949) 206-5353 Email: becca.nottberg@res.net | Trade Debt | | | | $233,284.00 |
| 32 | Operational Excellence Attn.: Tony Galluzzo 19712 MacArthur Blvd., Suite 110 Irvine, California 92612 | Attn.: Tony Galluzzo Phone: (949) 988-7229 Email: tgalluzzo@ca-usa.com | Trade Debt | | | | $231,378.00 |
| 33 | US Bank Trust NA Att.: Kirk Larson 300 East Delaware; 8th Floor Wilmington, Delaware 19809 | Attn.: Kirk Larson Phone: (651) 466-5666 Email: kirk.larson1@usbank.com | Trade Debt | | | | $230,809.00 |
| 34 | Wolfe & Wyman LLP Attn.: Stuart B. Wolfe 11811 N. Tatum, Suite 3031 Phoenix, Arizona 85028-1621 | Attn.: Stuart B. Wolfe Phone: (602) 953-0100 Email: sbwolfe@wolfewyman.com | Professional Services | | | | $228,398.00 |

EXHIBIT A

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35 | Five Brothers Mortgage Servs Attn.: Dawn Whiteaker 12220 E. 13 Mile Road; Suite 100 Warren, Missouri 48093 | Attn.: Dawn Whiteaker Phone: (586) 354-2017 Email: dawnrw@fiveonline.com | Trade Debt | | | | $224,947.00 |
| 36 | Servicelink Default Title & Closing Attn.: Joe Greve 1355 Cherrington Parkway Moon Township, Pennsylvania 15108 | Attn.: Joe Greve Phone: (216) 374-1888 Email: joe.greve@svclnk.com | Trade Debt | | | | $218,298.00 |
| 37 | Level 3 Communications LLC Attn.: Timothy McGraw 600 W. Chicago Avnue, Suite 325 Chicago, Illinois 60654 | Attn.: Timothy McGraw Phone: (612) 392-7364 Email: timothy.mcgraw@level3.com | Trade Debt | | | | $209,330.00 |
| 38 | Xome Field Services LLC Attn.: Allen Illgen 444 East Washington Street Indianapolis, Indiana 46204 | Attn.: Allen Illgen Phone: (612) 207-4012 Email: allen.illgen@assurant.com | Trade Debt | | | | $206,077.00 |
| 39 | RAS Boriskin LLC Attn.: Sara Borskin 900 Merchants Concourse Westbury, New York 11590 | Attn.: Sara Boriskin Phone: (516) 280-7675 Email: sboriskin@rasboriskin.com | Trade Debt | | | | $202,336.00 |
| 40 | ISGN Corporation Attn.: E. Rock Primas 2330 Commerce Park Drive, NE, Suite 2 Palm Bay, Florida 32905 | Attn.: E. Rock Primas Phone: (609) 932-4712 Email: rock.primas@isgnsolutions.com | Trade Debt | | | | $200,850.00 |

EXHIBIT A

**Fill in this information to identify the case:**

Debtor name: __Ditech Financial LLC__

United States Bankruptcy Court for the: __Southern__ District of __New York__
<br>(State)

Case number (*If known*): _____

## Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors                12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING – Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)
- ☐ Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)
- ☐ Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)
- ☐ Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)
- ☐ Schedule H: Codebtors (Official Form 206H)
- ☐ Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)
- ☐ Amended Schedule ____
- ☑ Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 40 Largest Unsecured Claims and Are Not Insiders (Official Form 204)
- ☐ Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __February 11, 2019__          X __/s/ Kimberly Perez_____
<br>MM /DD /YYYY                                         Signature of individual signing on behalf of debtor

__Kimberly Perez_____
<br>Printed name

__Senior Vice President and Chief Accounting Officer_____
<br>Position or relationship to debtor

Official Form 202          Declaration Under Penalty of Perjury for Non-Individual Debtors

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------- x
In re                                          :
                                               :      Chapter 11
                                               :
DITECH FINANCIAL LLC,                          :      Case No. 19– _____ (   )
                                               :
                     Debtor.                   :
----------------------------------------------------------- x
```

### LIST OF EQUITY HOLDERS[1]

Pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, the

following identifies all holders having a direct or indirect ownership interest of the above-

captioned debtor in possession (the "**Debtor**").

| Name and Last Known Address or Place of Business of Holder | Number of Securities/Kind of Interest |
|---|---|
| Walter Management Holding Company LLC<br>1100 Virginia Drive<br>Suite 100A<br>Fort Washington, PA 19034 | 100 % (Equity) |

---

[1] This list serves as the required disclosure by the Debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure. All equity positions listed are as of the date of commencement of the chapter 11 case.

EXHIBIT A

**Fill in this information to identify the case:**

Debtor name: <u>Ditech Financial LLC</u>

United States Bankruptcy Court for the: <u>Southern</u> District of <u>New York</u>
(State)

Case number (*If known*): _____

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors                    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING – Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)
- ☐ Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)
- ☐ Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)
- ☐ Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)
- ☐ Schedule H: Codebtors (Official Form 206H)
- ☐ Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)
- ☐ Amended Schedule _____
- ☐ Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 40 Largest Unsecured Claims and Are Not Insiders (Official Form 204)
- ☑ Other document that requires a declaration <u>List of Equity Holders</u>

I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>February 11, 2019</u>        X   <u>/s/ Kimberly Perez</u>
MM / DD /YYYY                              Signature of individual signing on behalf of debtor

                                          <u>Kimberly Perez</u>
                                          Printed name

                                          <u>Senior Vice President and Chief Accounting Officer</u>
                                          Position or relationship to debtor

Official Form 202            Declaration Under Penalty of Perjury for Non-Individual Debtors

EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
:
In re                                                    :        Chapter 11
:
DITECH FINANCIAL LLC,                                    :        Case No. 19-[_____] (___)
:
Debtor.                                          :
:
Fed. Tax Id. No. 41-1795868                             :
------------------------------------------------------------x

### CONSOLIDATED CORPORATE OWNERSHIP
### STATEMENT PURSUANT TO FED. R. BANKR. P. 1007 AND 7007.1

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure and Rule 1007-3 of the Local Bankruptcy Rules for the Southern District of New York, Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) ("**Ditech**") and its debtor affiliates, as debtors and debtors in possession in the above captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent:

1.     To the best of the Debtors' knowledge and belief, as of the date hereof (the "**Commencement Date**"), based solely on publicly available information, no entity directly or indirectly owns 10% or more of Ditech's common stock.

2.     To the best of the Debtors' knowledge and belief, as of the Commencement Date, based solely on publicly available information, Lion Point Master, LP owns approximately 38.1% of the convertible preferred shares of Ditech, First Pacific Advisors LLC owns approximately 11.1% of the convertible preferred shares of Ditech, and no other entity directly or indirectly owns 10% or more of Ditech's convertible preferred shares.

3.     Ditech has a one hundred percent (100%) ownership interest in the following entities:

        i.     Walter Reverse Acquisition LLC

EXHIBIT A

      ii.     Green Tree Credit Solutions LLC

      iii.    Marix Servicing LLC

      iv.    Mid-State Capital, LLC[1]

      v.     Hanover SPC-A, Inc.*

      vi.    WIMC Real Estate Investment LLC*

4.     Walter Reverse Acquisition LLC has a one hundred percent (100%) ownership interest in Reverse Mortgage Solutions, Inc.

5.     Reverse Mortgage Solutions, Inc. has a one hundred percent (100%) ownership interest in the following entities:

      i.     Mortgage Asset Systems, LLC

      ii.     REO Management Solutions, LLC

      iii.    RMS REO BRC, LLC*

      iv.    RMS REO CS, LLC*

      v.     RMS REO BRC II, LLC*

      vi.    RMS 2018-09, LLC*

6.     Green Tree Credit Solutions LLC has a one hundred percent (100%) ownership interest in the following entities:

      i.     Green Tree Insurance Agency of Nevada, Inc.

      ii.     Walter Management Holding Company LLC

      iii.    DF Insurance Agency LLC

      iv.    Green Tree Investment Holdings III LLC

7.     Walter Management Holding Company LLC has a one hundred percent

---

[1] Mid-State Capital, LLC and each other entity noted with a (*) are not debtors in these chapter 11 cases.

EXHIBIT A

(100%) ownership interest in the following entities:

    i.    Green Tree Credit LLC

    ii.    Green Tree Servicing Corp.

    iii.    Ditech Financial LLC

8.    Ditech Financial LLC has a one hundred percent (100%) ownership interest in the following entities:

    i.    Green Tree Advance Receivables III LLC*

    ii.    Ditech Agency Advance Depositor LLC*

    iii.    Ditech PLS Advance Depositor LLC*

9.    Attached hereto as **Exhibit A** is an organizational chart reflecting all of the ownership interests of the Debtors and their non-Debtor affiliates as of the Commencement Date.

EXHIBIT A

**Exhibit A**

**Organizational Chart**

EXHIBIT A



EXHIBIT A

**Fill in this information to identify the case:**

Debtor name: Ditech Financial LLC _____

United States Bankruptcy Court for the: Southern District of New York
(State)

Case number (*If known*): _____

# Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors                12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING – Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)
- ☐ Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)
- ☐ Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)
- ☐ Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)
- ☐ Schedule H: Codebtors (Official Form 206H)
- ☐ Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)
- ☐ Amended Schedule _____
- ☐ Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 40 Largest Unsecured Claims and Are Not Insiders (Official Form 204)
- ☑ Other document that requires a declaration Consolidated Corporate Ownership Statement

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  February 11, 2019          **X** /s/ Kimberly Perez _____
MM /DD /YYYY                        Signature of individual signing on behalf of debtor

 Kimberly Perez _____
Printed name

 Senior Vice President and Chief Accounting Officer _____
Position or relationship to debtor

EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
|   |   :   |   |
| **In re** | : | **Chapter 11** |
|   | : |   |
| **DITECH HOLDING CORPORATION**, *et al.*, | : | **Case No. 19-10412 (JLG)** |
|   | : |   |
| **Debtors.**[1] | : | **(Jointly Administered)** |
|   | : | Related Docket No. 9, 55, 187 |
-------------------------------------------------------------x

**FINAL ORDER (I) AUTHORIZING**
**DEBTORS TO CONTINUE ORIGINATION**
**AND SERVICING OF FORWARD MORTGAGE LOANS IN ORDINARY**
**COURSE AND GRANTING RELATED RELIEF AND (II) MODIFYING AUTOMATIC**
**STAY ON A LIMITED BASIS TO FACILITATE DEBTORS' ONGOING OPERATIONS**

Upon the motion dated February 11, 2019 (the "**Motion**")[2] of Ditech Holding

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates,

the "**Company**"), pursuant to sections 105(a), 362, 363(c), 1107(a), and 1108 of the Bankruptcy

Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors request authority, but not

direction, to continue in the ordinary course of business (a) to originate and purchase mortgage

loans; (b) to sell and securitize loans, including by performing under certain agreements with

Fannie Mae, Freddie Mac, Ginnie Mae, and private parties; (c) to service and subservice loans

pursuant to terms and conditions set forth in certain agreements with Fannie Mae, Freddie Mac,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).   The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.  As used herein, the term "mortgage" and similar formulations include both mortgages and deeds of trust.



EXHIBIT
B

Ginnie Mae, other applicable federal agencies, and private parties; (d) to make servicing advances; (e) to pay prepetition amounts owed to critical vendors; (f) to fulfill compliance and regulatory obligations; and (g) to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and Final Hearing (defined below) having been provided to the Notice Parties as set forth in the affidavit of service filed with respect thereto [ECF No. 45]; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis on February 13, 2019 (the "**Interim Hearing**"); and the Court having entered an order granting the relief requested in the Motion on an interim basis [ECF No. 55] and scheduling a final hearing on the Motion for March 14, 2019 (the "**Final Hearing**"); and, if necessary, the Final Hearing having been held to consider the relief requested in the Motion on a final basis; and upon the Lombardo Declaration, filed contemporaneously with the Motion, and the record of the Interim Hearing and the Final Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the

2

WEIL:\96961917\1\41703.0010
EXHIBIT A

ELECTRONICALLY FILED
2019 Apr 01 1:46 PM
CLERK OF COURT

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis to the extent set forth herein.

### Forward Mortgage Origination Business

2.      The Debtors are authorized but not directed, to continue in the ordinary

course of business:

      (a)      to fund their origination and purchase of mortgage loans and to pay related obligations, regardless of whether such obligations arose prepetition or postpetition;

      (b)      (i) to honor and perform under the GSE Sales Agreements, (ii) to pay the GSE Guaranty Fees, (iii) to honor and pay the GSE Repurchase Obligations, and (iv) to perform other activities and pay fees related to mortgage loan origination, including paying all obligations related to loans originated prepetition;

      (c)      (i) to honor and perform under the Ginnie Mae Agreements, (ii) to honor and pay the Ginnie Mae Buyout Obligations, (iii) to pay the Ginnie Mae Fees, and (iv) to pay the Ginnie Mae Administrative Fees, including, in each instance, all obligations related to loans originated prepetition; and

      (d)      (i) to sell mortgage loans to private investors and (ii) to enter into, and perform under, MLPAs, including, to pay all obligations related to loans originated prepetition.

### Forward Mortgage Servicing Business

3.      The Debtors are authorized but not directed, to continue in the ordinary

course of business:

      (a)      to service and subservice GSE Loans in the ordinary course, including by continuing to perform under the GSE Servicing Agreements and by continuing to honor and pay the GSE Repurchase Obligations and all prepetition amounts arising under the GSE Servicing Agreements;

WEIL:\96961917\1\41703.0010
EXHIBIT A

(b)   to service Ginnie Securitized Loans in the ordinary course, including by continuing to perform under the Ginnie Mae Agreements and the applicable Government Loan Servicing Guidelines;

(c)   to service and subservice Private Loans in the ordinary course, including by continuing to perform under the Private Servicing Agreements;

(d)   (i) to sell MSRs and related reimbursement rights for Servicer Advances and (ii) the NRM Servicing Transition;

(e)   to service and subservice loans;

(f)   to make Servicer Advances, whether arising from prepetition or postpetition obligations, in accordance with the Agency Servicing Agreements and Private Servicing Agreements, as applicable;

(g)   (i) to modify loans and to participate in loan modification programs, (ii) make and/or accept Loss Mitigation Payments, which payments, for the avoidance of doubt, may include payments or other concessions to or from borrowers, lienholders, mortgagors, the heirs, estates, and other successors in interest of the foregoing, tenants, title companies, title insurers, purchasers from a tax sale or a foreclosure sale, or other parties with a claimed interest in the subject property or loan (each, an "**Interested Party**") with respect to foreclosures, evictions, Title Disputes (as defined below), collection actions, insurance disputes, replevins, and similar servicing related actions, and (iii) to enter into, and perform under existing, Deferment and Forbearance Arrangements, which agreements, for the avoidance of doubt, may include agreements with Interested Parties to compromise or settle claims related to loans owned, serviced or subserviced by the Debtors, and including honoring all obligations related thereto that accrued in whole or part prior to the Commencement Date;

(h)   to engage in nonperforming loan servicing activities with respect to Agency Loans, including (i) to conduct foreclosures, short sales, deeds in lieu of foreclosure, evictions, and similar actions, including to honor and to enter into settlements and other arrangements related thereto, including on behalf of investors in accordance with the Debtors' existing servicing and subservicing obligations, (ii) to pay any T&I Advances and Corporate Advances, including any prepetition amounts owed, with respect to (A) GSE Loans in accordance with the applicable GSE Servicing Agreements and (B) Ginnie Securitized Loans until such loans are conveyed to the FHA or transferred into the custody of the VA, in

WEIL:\96961917\1\41703.0010
EXHIBIT A

each case as required pursuant to the applicable Government Loan Servicing Guidelines, (iii) to pay any P&I Advances, including any prepetition amounts owed, with respect to Ginnie Securitized Loans until such loans are conveyed to the FHA or transferred into the custody of the VA, in each case as required pursuant to the Ginnie Mae Agreements and the applicable Government Loan Servicing Guidelines, (iv) to distribute net sale proceeds to the appropriate parties in accordance with the applicable Agency Servicing Agreements, and (v) as necessary, to transfer or assign deeds to Agency REOs to the applicable owner of the Agency REO; and

(i)    to engage in nonperforming loan servicing activities with respect to Private Loans, including to (i) pay any Servicer Advances—including any prepetition amounts owed—with respect to Private REOs and Private Loans in foreclosure, (ii) sell Private REOs, whether owned by the Debtors or on behalf of third parties in the Debtors' capacity as servicer or subservicer, on an "as is where is" basis and without any representation and warranties except for title, in their discretion and subject to their business judgment, and free and clear of any and all liens and encumbrances either pursuant to (A) section 363(f) of the Bankruptcy Code, to the extent that the Private REO is owned by the Debtors, or (B) applicable non-bankruptcy law, to the extent the Private REO is owned by third parties; *provided that,* should any lien, claim, or encumbrance exist on such Private REOs, such liens, claims, or encumbrances shall attach to the proceeds from the sales thereof, (iii) remit (A) overpayments to purchasers and (B) net sale proceeds to the appropriate parties, and (iv) conduct foreclosures, short sales, deeds in lieu of foreclosure, evictions, and similar actions, including to honor and to enter into settlements and other arrangements related thereto, including on behalf of investors in accordance with the Debtors' existing servicing and subservicing obligations, each of (i) through (iv) in accordance with the relevant Private Servicing Agreements.

4.    As to mortgage loans not owned by Ditech, principal, interest, and funds for the payment of property taxes and insurance premiums collected by Ditech in connection with its performance of its Servicing Functions do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code, and no lien or other interest therein will be given by the Debtors to any party.

WEIL:\96961917\1\41703.0010
EXHIBIT A

### Additional Relief Related to Forward Mortgage Origination and Servicing Businesses

5.      The Debtors are authorized but not directed, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay related obligations, (b) to submit to, and comply with, state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (iv) to incur and pay certain expenses, (v) to pay the costs and expenses of state and federal regulatory examinations, (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators, and (vii) to perform any other adjustments to borrowers' accounts as part of the Debtors' compliance obligations.

6.      If, after the Commencement Date, a Specified Servicing Default (as defined below) under any Specified Agreement (as defined below) has occurred, then the Specified Counterparty (as defined below) under such Specified Agreement may, in accordance with the terms of such Specified Agreement and notwithstanding the automatic stay, issue a written notice declaring that such Specified Servicing Default has occurred and is continuing (a "**Specified Servicing Default Notice**"), to the Debtors and their counsel, the DIP Agent and its counsel, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (the "**Creditors' Committee**"), and counsel to the Consenting Term Lenders (collectively, the "**Specified Servicing Default Notice Parties**").  To be effective hereunder, any Specified Servicing Default Notice shall (i) specify that it is a "Specified Servicing Default Notice", (ii) identify and attach copies of the relevant Specified Agreement(s), and (iii) otherwise comply with the requirements for such notice

WEIL:\96961917\1\41703.0010
EXHIBIT A

under the applicable Specified Agreement.   If a Specified Servicing Default Notice has been delivered in accordance with this paragraph and the alleged Specified Servicing Default is not cured within the longer of (x) three (3) business days of the Specified Servicing Default Notice Parties' receipt of such Specified Servicing Default Notice and (y) the applicable cure, grace, or notice period set forth in the Specified Agreement, then, upon the running of such cure, grace or notice period, the Specified Counterparty may move for relief from the automatic stay in connection with such Specified Servicing Default, which such motion may be heard by this Court on an expedited basis (but in any event, no earlier than five (5) days after such motion is filed with this Court and served on the Specified Servicing Default Notice Parties) (a "**Lift Stay Motion**").   At any hearing on any Lift Stay Motion, the applicable standards and burdens of proof and persuasion for relief from the automatic stay shall apply.   Notwithstanding the automatic stay, solely to the extent necessary to effectuate its rights pursuant to this paragraph, and subject to the express terms of the applicable Specified Agreement, a Specified Counterparty may give notice to a Debtor in its servicing or servicing-related role pursuant to a Specified Agreement of the occurrence of any event, condition or default that, with the giving of notice, the passage of time, or both, would become a Specified Servicing Default.  For purposes of this paragraph:

   (a)   "**Specified Agreement**" means any Private Servicing Agreement, pooling and servicing agreement, or similar servicing agreement, in any such case, (x) permitting the securitization trustee, indenture trustee, or similar trustee party to such agreement (an "**MBS Trustee**") a right to terminate servicing for the Private Loans placed in the securitization trust subject to such agreement and (y) under which a Debtor is performing a servicing or servicing-related role postpetition in accordance with the relief granted in this Order with respect to Private Loans that have been securitized;

   (b)   "**Specified Counterparty**" means the MBS Trustee party to such Specified Agreement; and

   (c)   "**Specified Servicing Default**" means a failure by any Debtor to timely (i) make a Servicer Advance, or (ii) remit or make deposits of assets, in any such case of clause (i) or (ii), required to be made or remitted by such Debtor, in its servicing or servicing-related role,

WEIL:\96961917\1\41703.0010
EXHIBIT A

pursuant to any Specified Agreement, which failure has continued beyond any applicable cure, grace or notice period set forth in such Specified Agreement and as a result of which the Specified Counterparty under such Specified Agreement would otherwise have the current right (but for the effect of the automatic stay and the provisions of this paragraph) to terminate the applicable Debtor from such servicing or servicing related role pursuant to the terms of such Specified Agreement.

7.     For the avoidance of doubt, nothing herein nor the performance of the Debtors hereunder shall convert a prepetition debt to a postpetition administrative expense claim.

## Critical Vendors

8.     Pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors (each, a "**Critical Vendor Claim**"), upon such terms and in the manner provided in this Order and the Motion and subject to the Management Approval Process (as defined below); *provided*, that payments to Critical Vendors on account of prepetition claims shall not exceed $40 million during the chapter 11 cases; *provided*, *further*, that payments to Critical Vendors on account of such prepetition claims may not be accelerated and shall be made only in the ordinary course in accordance with Customary Trade Terms.

9.     As used herein, the term "**Management Approval Process**" means the advance review and approval by the chief financial officer of the Company, following consultation with the Debtors' management and AlixPartners, LLP (collectively, with the chief financial officer, the "**Vendor Council**"), of payment of a Critical Vendor Claim. Twenty-four hours prior to any meeting of the Vendor Council to approve payment of any Critical Vendor Claim (the "**Review Period**"), the Debtors shall provide the Creditors' Committee's advisors with the following information:

WEIL:\96961917\1\41703.0010
EXHIBIT A

(a)  the summary schedules provided to the Vendor Council in connection with such proposed payments of Critical Vendor Claims; and

(b)  a detailed listing of each such proposed payment of a Critical Vendor Claim, as well as supporting documentation, which listing and documentation shall be consistent with the form of information previously provided to the Creditors' Committee's advisors in connection with the previous payments of Critical Vendor Claims made by the Debtors.

During the Review Period, the Creditors' Committee may communicate with AlixPartners, LLP and the designated representatives of the Debtors in order to discuss the proposed payments of Critical Vendor Claims, it being understood, however, that the receipt of the above described information by the Creditors' Committee and its right to have communications with AlixPartners, LLP and the Debtors' representatives with respect thereto shall not (a) constitute grounds for the Creditors' Committee to object to the payment of any Critical Vendor Claim or (b) grant any consent right to the Creditors' Committee to the payment of any Critical Vendor Claim.

10.    As soon as reasonably practicable following entry of this Order, the Debtors shall provide a list of potential Critical Vendors and potential Critical Vendor Claims to the Court and the U.S. Trustee (the "**Critical Vendors List**").  The Critical Vendors List shall not be publicly filed.  The Debtors shall not pay a claim as a Critical Vendor Claim unless such claim is set forth on the Critical Vendors List; provided, that the Debtors may update the Critical Vendors List from time to time with two business days' written notice and opportunity to object to the U.S. Trustee and the advisors to the Creditors' Committee.

11.    Promptly after entry of this Order and weekly thereafter, the Debtors shall provide counsel for the Creditors' Committee, counsel to the Term Loan Lender Ad Hoc Group, and the U.S. Trustee with a schedule of all payments made to the Critical Vendors on account of

EXHIBIT A

the Critical Vendor Claims in accordance with the terms of this Order, which shall include the name and address of the Critical Vendor and the amount and date of the payment.

12.     If a Critical Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, upon notice to the Creditors' Committee, and without further order of the Court:

(a)     Declare that any payments made to the Critical Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Vendor without further order of the Court or action by any person or entity; and

(b)     Take actions to recover or seek disgorgement of any payment made to the Critical Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Vendor, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

13.     Under such circumstances, such Critical Vendor shall immediately repay to the Debtors any payment made to it on account of its prepetition claims to the extent that such payments exceed its postpetition claims, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

14.     Nothing herein shall:

(a)     Constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Vendor;

(b)     Be construed to waive, limit, or in any way affect the Debtors' ability to dispute a claim of a Critical Vendor;

(c)     Be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Order;

10

     (d)     Be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor; or

     (e)     Be deemed to require the Debtors to make any of the payments to the Critical Vendors authorized herein.

15. Notwithstanding entry of this Order, the Debtors' rights to enforce the automatic stay provision of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

### Limited Relief from Automatic Stay

*Borrower Foreclosure, Eviction, and Related Proceedings*

16. The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to allow Interested Parties to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure, eviction, replevin, actions on the note, and collection actions (each a "**Default Action**") brought by the Debtors to the limited extent such claims, cross-claims, third-party claims, and counterclaims, including the appeal and settlement of such, (a) have the sole purpose of defending, unwinding, or otherwise enjoining or precluding the relief sought by the Debtors in the Default Action, (b) are necessary for the resolution of such Default Action, (c) do not result in any order, judgment, or decree against the Debtors entitling any party to an award of money damages, including, without limitation, Interested Parties' attorneys' fees or costs, and (d) do not result in a claim against property of any Debtor's estate, other than as expressly allowed in Paragraph 20 below (collectively, the "**Permitted Default Actions**").

17. Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all pending or future claims, cross-claims, third-party

WEIL:\96961917\1\41703.0010
EXHIBIT A

claims, and counterclaims by Interested Parties other than the Permitted Default Actions, including those with respect to (a) monetary relief of any kind or any nature against the Debtors, including, without limitation, Interested Parties' attorneys' fees or costs, (b) claims of recoupment or setoff, and (c) actions asserted in the form of a class action or collective action.

18.    For convenience, to avoid prejudice, or to expedite and economize, the claims described in Paragraph 16 above may proceed separately from any other claim that is stayed by the Bankruptcy Code.  Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

*Borrower Bankruptcy Proceedings*

19.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who has sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**"), is hereby modified pursuant to the following terms and conditions:

    (a)    except as set forth herein, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

        (i)    to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure (collectively, the "**Required Bankruptcy Documents**") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

        (ii)   to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

        (iii)  to assert appeals with respect to items (i) and (ii); and

        (iv)   to seek an accounting from the Debtors with respect to the Bankrupt Borrower's loan;

12

EXHIBIT A

(b)    except as set forth herein, a Bankrupt Borrower shall be entitled:

  (i)    to engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankrupt Borrower's loan; and

  (ii)    to engage in discussion with the Debtors and execute a modification of the Bankrupt Borrower's loan or otherwise discuss, enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)    absent further order of this Court, the automatic stay shall remain in full force and effect with respect to all the Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:[3]

  (i)    for monetary relief of any kind and of any nature against the Debtors, including, without limitation, attorneys' fees or costs, with the exception of adjustments resulting from objections permitted pursuant to Paragraph 19(a)(i) above;

  (ii)    for violation of any local, state, or federal statute or other law in connection with the origination of the Bankrupt Borrower's loan; or

  (iii)    asserted in the form of a class action;

(d)    absent further order of this Court, the automatic stay shall remain in full force and effect with respect to (a) any party seeking to intervene in a Bankrupt Borrower's bankruptcy case to assert claims against the Debtors on behalf of itself or others (including, without limitation, a class of borrowers) and (b) any class action or collective action brought by any Bankrupt Borrower on behalf of any class;

(e)    with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim for which the automatic stay has been lifted by the terms of this Order;

---

[3]    United States Trustees have been included in this provision out of an abundance of caution. However, as referenced in Paragraph 31 of this Order, nothing herein shall be construed to limit the rights of the Office of the United States Trustee to take any action in these chapter 11 cases not subject to the automatic stay.

WEIL:\96961917\1\41703.0010
EXHIBIT A

(f)    the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

(g)    nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

(h)    should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such dispute.

*Actions Involving Amount, Validity, or Priority of Liens*

20.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**")[4] is hereby modified to allow Interested Parties to defend and assert and prosecute claims, cross-claims, third-party claims, and counter-claims, including the appeal or settlement of such, in Title Disputes, to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) are necessary for the resolution of such Title Dispute and (b) do not result in any order, judgment, or decree against the Debtors entitling any party to an award of money damages including, without limitation, Interested Parties' attorneys' fees or costs (collectively, the "**Permitted Title Disputes**").

21.    Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all pending or future claims, cross-claims, third-party

---

[4]    These actions include quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action.

claims, and counterclaims against the Debtors other than the Permitted Title Disputes, including those with respect to (a) monetary relief of any kind or any nature against the Debtors, including, without limitation, Interested Parties' attorneys' fees or costs, (b) actions for partition or criminal forfeiture or seizure of the property securing lien(s) held by the Debtors, (c) relief that is not necessary for the resolution of the Title Dispute, or (d) actions asserted in the form of a class action or collective action.

22.     For convenience, to avoid prejudice, or to expedite and economize, the claims described in Paragraph 20 above may proceed separately from any other claim that is stayed by the Bankruptcy Code.  Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

### Additional Relief Related to Fannie Mae, Freddie Mac, and Ginnie Mae

23.     The Debtors are authorized to provide to Fannie Mae, Freddie Mac, and Ginnie Mae assurances of future performance under the applicable Agency Agreements on the terms and conditions set forth in **Schedules 1**, **2**, and **3** to this Order and to comply therewith; *provided, that*, nothing herein, including the provision of such assurances, shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and Fannie Mae, Freddie Mac, or Ginnie Mae, as applicable. The acceptance by Fannie Mae, Freddie Mac, and Ginnie Mae of the assurances and related relief granted pursuant to this Order shall not be deemed to constitute consent by Fannie Mae, Freddie Mac, and Ginnie Mae of the assumption and assignment of the applicable Agency Agreements or to the release of any Debtor from any obligations under the Ginnie Mae Agreements. Notwithstanding anything herein or in any order to the contrary, Fannie Mae, Freddie Mac, and

WEIL:\96961917\1\41703.0010
EXHIBIT A

Ginnie Mae may seek additional assurances or modification to its grant of assurances provided herein so as to provide different or additional assurance, without prejudice to the right of the Debtors or any other party in interest to contest any such addition or modification.

24.    For the avoidance of doubt, all payments by the Debtors to Fannie Mae, Freddie Mac, Ginnie Mae, and Ginnie Mae guaranteed RMBS investors under the Agency Agreements (including, without limitation, repurchase or repurchase-related requests and requests for payments of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related escrows, fees and claims) shall be made free and clear of any lien, security interest, or other interest of any party, including, without limitation, any prepetition or postpetition lenders.

25.    Nothing in this Order constitutes a determination of the applicability, if any, of the automatic stay under Bankruptcy Code section 362(a) to requests by Fannie Mae, Freddie Mac, or Ginnie Mae to the Debtors to honor their origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, including, without limitation, repurchase or repurchase-related requests and requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Agency Agreements, and the rights of all parties are reserved with respect thereto.  Without limiting the foregoing, in the event of a failure by any Debtor to timely (i) make a Servicer Advance, or (ii) remit or deposit receipts of the relevant mortgagee's assets, in any such case, required to be made or remitted by such Debtor, in its servicing or servicing-related role, pursuant to any Fannie Agreement or any Freddie Agreement, which failure has continued beyond any applicable cure, grace or notice

16

WEIL:\96961917\1\41703.0010
EXHIBIT A

period set forth in such Fannie Agreement or Freddie Agreement and as a result of which Fannie Mae or Freddie Mac, as applicable, under such Fannie Agreement or Freddie Agreement would otherwise have the current right (but for the effect of the automatic stay, to the extent applicable) to terminate the applicable Debtor from such servicing or servicing related role pursuant to the terms of such Fannie Agreement or Freddie Agreement, then Fannie Mae or Freddie Mac, as applicable, may elect to avail itself of procedures set forth in Paragraph 6 above, with respect to such failure.

26.     To the extent that the automatic stay under Bankruptcy Code section 362(a) applies to requests by Fannie Mae, Freddie Mac, and Ginnie Mae that the Debtors honor their origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, the automatic stay is hereby modified to the limited extent necessary to allow Fannie Mae, Freddie Mac, and Ginnie Mae to make such requests to the Debtors, including, without limitation, repurchase or repurchase-related requests and requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Agency Agreements; *provided, that*, Fannie Mae, Freddie Mac, and Ginnie Mae reserve all rights to assert that they may exercise any and all rights available to them under their respective agreements notwithstanding the automatic stay.

### Other Relief

27.     Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim

WEIL:\96961917\1\41703.0010
EXHIBIT A

against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

28.     Notwithstanding anything to the contrary contained herein or in the Motion, any payment, obligation or other relief authorized by this Order shall be subject to and limited by the requirements imposed on the Debtors under the terms of any interim and/or final order approving the *Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* [ECF No. 26], as may be amended or superseded from time to time, or any budget in connection therewith, entered by this Court in these chapter 11 cases.

29.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

30.     Nothing herein shall be construed to limit the right of any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to take any action not subject to the automatic stay.

31.     Nothing herein shall be construed to narrow or limit any exception to the automatic stay under section 362(b) of the Bankruptcy Code applicable to the United States Trustee Program or any other governmental unit pursuant to any police and regulatory power.

WEIL:\96961917\1\41703.0010
EXHIBIT A

32.    Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

33.    Notwithstanding  Bankruptcy  Rule  6004(h),  this  Order  shall  be immediately effective and enforceable upon its entry.

34.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

35.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.


Dated: March 20, 2019
          New York, New York

                                          /s/ *James L. Garrity, Jr.*
                                          HONORABLE JAMES L. GARRITY, JR.
                                          UNITED STATES BANKRUPTCY JUDGE

WEIL:\96961917\1\41703.0010
EXHIBIT A

**<u>Schedule 1</u>**

**Fannie Mae Assurances of Future Performance**

## Fannie Mae Assurances of Future Performance[1]

1. Ditech shall provide Fannie Mae staff with regular access to Ditech facilities, including reasonable access to its books, records, and accounts, so as to allow Fannie Mae to oversee Ditech's performance of its servicing duties.

2. Ditech shall at all times maintain its servicing performance to the standards set forth in certain Fannie Mae Mortgage Selling and Servicing Contract dated as of March 23, 2005 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Mae Mortgage Selling and Servicing Contract**"), which includes that certain Selling Guide: Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Selling Guide**") and that certain Servicing Guide: Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Servicing Guide**" and, together with the Fannie Selling Guide, the "**Fannie Guides**"), that certain Subservicing Agreement effective as of December 22, 2010 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Subservicing Agreement**"), and that certain Pledge and Security Agreement effective as of December 19, 2014 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Pledge Agreement**" and, together further with the Fannie Mae Mortgage Selling and Servicing Contract, the Fannie Subservicing Agreement, and the Fannie Guides, the "**Fannie Agreements**"), as well as to the following supplemental standards:

   (a) As to each separate portfolio of Fannie Mae loans serviced or subserviced by Ditech, Ditech shall maintain monthly STAR Scorecard metrics as good as or better than such metrics for such portfolio as of the month ending November 30, 2018;

   (b) No STAR overall operational assessment can result in a rating of "red";

   (c) Any formal servicing compliance review must not return an overall risk rating of 'high';

   (d) As applicable, Ditech shall comply with the High Touch Servicing Protocols previously agreed to by Fannie Mae and Ditech;

   (e) Ditech shall use best efforts to reduce the net population of seriously delinquent loans;

   (f) Ditech shall timely comply with all servicing action plans;

   (g) Ditech shall deliver custodial account reconciliations of all P&I and T&I accounts relating to Fannie Mae Loans via tapes to Fannie Mae on or before the fifteenth day of the month immediately following the reconciliation period;

   (h) Ditech shall provide Fannie Mae with a copy of its key employee retention program and key employee incentive program;

---

[1] Capitalized terms used but not otherwise defined herein or in the Motion shall have the meaning ascribed to such term in the Fannie Agreements (as defined below).

EXHIBIT A

(i)  Ditech shall at all times maintain staffing levels commensurate with the servicing portfolio, including maintaining adequate staffing within the requisite servicing departments;

(j)  Ditech shall provide notice to Fannie Mae, within two (2) business days, of (i) senior management departures and/or (ii) the number of loans per employee falling below the level as of the date of the bankruptcy filing;

(k)  Ditech shall provide all reporting and other servicing information as reasonably requested by Fannie Mae, including such additional reports that may be requested, as currently permitted under the Fannie Servicing Guide;

(l)  Ditech shall continue regularly scheduled engagements with Fannie Mae, such as the monthly performance reviews at the current participation level, including Ditech senior management;

(m)  Ditech shall keep Fannie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions as it deems appropriate, which extensions will not be withheld solely on the basis of Ditech's bankruptcy proceedings;

(n)  Ditech shall deliver to Fannie Mae the following information: (i) on a quarterly basis, a completed Mortgage Bank Financial Reporting Form, (ii) monthly financial statements, and (iii) weekly liquidity reporting, in each case, on the same timeframe as such reports were delivered immediately prior to the Commencement Date;

(o)  Ditech shall continue to meet margin requirements as may be required under the Fannie Agreements in connection with the sale of loans; and

(p)  Ditech agrees to comply with the Fannie Servicing Guide to facilitate the orderly transfer of servicing rights to any new servicer where applicable.

3.  Ditech shall maintain response times to file requests (for both origination and servicing files) timely (within 30 days) as is current practice and Ditech will comply with Fannie Mae timelines for appeal letters, identifying "impasse loans", and for supplying missing documents as well as timely addressing aged repurchase issues.

4.  Ditech shall not grant a lien or security interest (including any adequate protection liens) in (a) any cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including, without limitation, the Fannie Pledge Agreement), or (b) any mortgage servicing rights with respect to mortgages which are now or hereafter serviced or subserviced by Ditech for Fannie Mae, except as otherwise expressly authorized by, that certain Acknowledgment Agreement With Respect to Servicing Advance Receivables, dated as of February 9, 2018 and effective as of February 12, 2018, and amended as of April 20, 2018 (as further amended, restated, supplemented or otherwise modified from time to time), among Fannie Mae, Ditech, Ditech Agency Advance Depositor LLC, Ditech Agency Advance Trust, Wells Fargo Bank, N.A, in its capacity as Indenture Trustee, and Barclays Bank PLC, in its capacity as Administrative Agent; or by that certain

WEIL:\96961917\1\41703.0010
EXHIBIT A

First Amended and Restated Acknowledgment Agreement dated as of February 9, 2018 (as amended, restated, supplemented or otherwise modified from time to time), among Fannie Mae, Ditech, Credit Suisse AG, Cayman Islands Brach, in its capacity as collateral agent for the First Lien Secured Party, and Wilmington Savings Fund Society, FSB, in its capacity as Collateral Agent for the Second Lien Secured Party.  In addition, Ditech shall not seek to modify or otherwise affect Fannie Mae's rights under the Fannie Mae Pledge Agreement.

WEIL:\96961917\1\41703.0010

EXHIBIT A

**Schedule 2**

**Freddie Mac Assurances of Future Performance**

WEIL:\96961917\1\41703.0010
EXHIBIT A

## Freddie Mac Assurances of Future Performance[1]

1.    Ditech shall provide Freddie Mac staff with regular access to Ditech facilities, including reasonable access to its books, records, and accounts, so as to allow Freddie Mac to oversee Ditech's performance of its servicing duties.

2.    Ditech shall at all times maintain its servicing performance consistent with the standards set forth in the that certain Master Agreement dated as of August 1, 2014, as amended and restated on October 6, 2017 (together with all supplements, addendums, amendments, and related agreements, the "**Freddie Master Agreement**"), that certain Purchase Agreement dated as of November 7, 2018 (together with all supplements, addendums, amendments, and related agreements, the "**Freddie Purchase Agreement**"), and the Freddie Mac Single-Family Seller/Servicer Guide (the "**Freddie Selling and Servicing Guide**" and, together with the Freddie Master Agreement and the Freddie Purchase Agreement, the "**Freddie Agreements**"), as well as with the following supplemental standards (*provided that*, nothing herein is intended to waive or release any of Ditech's current obligations under the Freddie Agreements):

(a)    In connection with any operation assessment by Freddie Mac's Counterparty Operations Risk Evaluation group ("**CORE**"), Ditech must maintain an operational assessment that is above "critical" or "major" for each finding in connection with such assessment.  If there is a finding by CORE of "critical," "major" or "other" for any matter that is within the scope of any CORE review, Ditech must remediate and address each such finding;

(b)    Ditech shall deliver custodial account reconciliations of all P&I and T&I accounts relating to Freddie Mac Loans via tapes to Freddie Mac on or before the fifth day of the month immediately following the reconciliation period;

(c)    Ditech shall provide Freddie Mac with a copy of its key employee retention program and key employee incentive program;

(d)    Ditech shall at all times maintain staffing levels commensurate with the servicing portfolio, including maintaining adequate staffing within the requisite servicing departments;

(e)    Ditech shall provide notice to Freddie Mac, within five business days, of senior management departures or larger-than-average departures of non-management personnel;

(f)    Ditech shall provide all reporting and other servicing information as reasonably requested by Freddie Mac, including (without limitation) fraud reports and such additional reports that may be requested by Freddie Mac, in accordance with the Freddie Selling and Servicing Guide;

---

[1]    Capitalized terms used but not otherwise defined herein or in the Motion shall have the meaning ascribed to such term in the Freddie Agreements (as defined below).

EXHIBIT A

(g)   Ditech shall confer and consult with Freddie Mac in good faith with respect to the implementation of any new programs/directives, and policy changes and Ditech will (i) comply with such changes if compliance is required pursuant to applicable law or regulation, or if noncompliance would itself constitute grounds for termination of Ditech as a seller/servicer under the Freddie Agreements, and (ii) use commercially reasonable efforts to comply with such changes in all other cases, notwithstanding possible additional costs to implement those changes;

(h)   Ditech shall keep Freddie Mac apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions as it deems appropriate, which extensions will not be withheld solely on the basis of Ditech's bankruptcy proceedings. As with other lenders, Freddie Mac will acknowledge, but not approve, extension requests and will not assert a breach based solely on such non-compliance for up to 90 days of non-compliance;

(i)   Ditech shall continue (post-filing) its regularly scheduled meetings and engagements with Freddie Mac, including (without limitation) monthly executive meetings and any and all reviews relating to the servicing of the Freddie Mac servicing portfolio;

(j)   Ditech shall maintain response times to file requests (for both origination and servicing files) timely (within 30 days), as is current practice, and Ditech will comply with Freddie Mac timelines for appeal letters, and for supplying missing documents, as well as timely addressing aged repurchase issues; and

(k)   Ditech agrees to comply with the Freddie Selling and Servicing Guide, and specifically Chapter 7101 thereof, to facilitate the orderly transfer of servicing rights to any new servicing agent where applicable.

3.   Ditech shall not grant a lien or security interest (including any adequate protection liens) in (a) any cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Amended and Restated Collateral Account Control Agreement, dated as of January 17, 2014, and the Amended and Restated Collateral Pledge Agreement, dated as of January 17, 2014) (collectively, the "**Freddie Mac Pledge Agreements**"), (b) any mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech for Freddie Mac, or (c) the "Servicing Collateral" as defined and referenced in, and except as otherwise expressly authorized by, that certain Second Amended and Restated Acknowledgement Agreement, dated as of October 30, 2015, among Freddie Mac, Ditech, and Credit Suisse AG, Cayman Islands Branch.  In addition, Ditech shall not seek to modify or otherwise affect Freddie Mac's rights under the Freddie Mac Pledge Agreements.

WEIL:\96961917\1\41703.0010
EXHIBIT A

## Schedule 3

**Ginnie Mae Assurances of Future Performance**

WEIL:\96961917\1\41703.0010
EXHIBIT A

### Ginnie Mae Assurances of Future Performance[1]

1.   Ditech shall provide Ginnie Mae staff and its designees with regular access to Ditech facilities, including reasonable access to its books, records, and accounts, so as to allow Ginnie Mae to oversee Ditech's performance of its securitization duties.

2.   Ditech shall at all times maintain its securitization performance to the standards set forth in that certain Master Servicing Agreement dated as of October 9, 2015 (collectively with the Cross-Default Agreement, that certain Escrow Tri-Party Agreement dated as of January 30, 2019, all guaranty agreements, RMBS prospectus documents, escrow agreements, acknowledgment agreements, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Master Servicing Agreements**") and the Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**" and, together with the Ginnie Mae Master Servicing Agreements, the "**Ginnie Mae Agreements**") as well as to the following supplemental or existing standards:

(a)   Ditech shall deliver custodial account reconciliations of all P&I and T&I accounts relating to Ginnie Securitized Loans via tapes to Ginnie Mae on or before the 15th day of the month immediately following the reconciliation period;

(b)   Ditech shall provide Ginnie Mae with a copy of its key employee retention program and key employee incentive program and updates to form HUD 11702, as applicable;

(c)   Ditech shall provide notice to Ginnie Mae of senior management departures and updates to form HUD 11702, as applicable, as required under the Ginnie Mae Agreements;

(d)   Ditech shall provide Ginnie Mae with a report identifying the Critical Vendors for the Ginnie Mae guaranteed RMBS portfolio and a contact list of parties (other than document custodians) to whom loan collateral documents have been or are delivered, including ancillary systems and location of any origination, credit, and servicing files, imaging, and records stored in hard copy format;

(e)   Ditech shall provide all reporting and other securitization information requested by Ginnie Mae, including such additional reports that may be reasonably requested, as currently permitted under the Ginnie Mae Agreements; and

(f)   Ditech shall keep Ginnie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions from Ginnie Mae, in Ginnie Mae's sole discretion, which extensions will not be withheld solely on the basis of Ditech's bankruptcy proceedings.  Ditech may not seek extensions of the statutory requirement to obtain mortgage insurance or guaranty for pooled loans or extensions of regulatory requirements.  A request to approve a transfer of issuer responsibility is not an extension request.

---

[1]   Capitalized terms used but not otherwise defined in the Motion shall have the meaning ascribed to such term in the Ginnie Mae Agreements (as defined below).

## EXHIBIT A

3.  Ditech shall maintain response times to file requests timely as is current practice and Ditech will comply with the requisite timelines pursuant to the Ginnie Mae Agreements.

4.  Ditech shall timely comply with the Ginnie Mae Buyout Obligations set forth in the Ginnie Mae Agreements.

5.  Ditech shall maintain delinquency rates on outstanding pools and loan packages below the threshold levels described in the Ginnie Mae Guide.

6.  Ditech shall comply with all the terms and conditions outlined in the Ginnie Mae Notice of Violation dated as of February 8, 2019.

2

WEIL:\96961917\1\41703.0010

EXHIBIT A